# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HUGH CAMPBELL McKINNEY
5985 S 45th E
Idaho Falls, ID 83406

        Plaintiff,

        v.

UNITED STATES DEPARTMENT
OF VETERANS AFFAIRS
810 Vermont Avenue NW
Washington, DC 20420

UNITED STATES DEPARTMENT
OF DEFENSE
1400 Defense Pentagon
Washington, DC 20301-1400

and

UNITED STATES ARMY
300 Army Pentagon
Washington, DC 20310-0300,

        Defendants.

Civil Action No. _____

# COMPLAINT

Army First Sergeant Hugh C. McKinney, retired ("McKinney"), brings this action to challenge components of a final rule adopted by the U.S. Department of Veterans Affairs ("VA") in collaboration with the U.S. Department of Defense ("DOD") concerning "wounded warrior" insurance provided through

- i -

the U.S. government.  McKinney also seeks to overturn a determination by the

U.S. Army ("Army") denying his eligibility to receive insurance benefits

arising from a traumatic brain injury sustained in Operation Iraqi Freedom.

McKinney alleges the following based on, *inter alia*, the administrative record

related to his claim concerning a scheduled loss, medical opinions from doctors

at VA medical centers, and unrebutted statements from percipient witnesses.

**T**ABLE OF **C**ONTENTS

Nature of the Action ..................................................................... 1

The Parties ................................................................................ 10

Jurisdiction and Venue.................................................................. 10

BACKGROUND AND ALLEGATIONS............................................. 12

I.     TBIs Are a Signature Wound From Serving in Iraq and
Afghanistan.................................................................... 12

II.    TBIs Are Widespread Among Service Members Who Served in
Iraq and Afghanistan. ....................................................... 14

III.   The Executive and Legislative Branches Were Well-Aware of
the Incidence of TBIs When Federal Traumatic Injury
Protection Was Created. ..................................................... 16

      A.   Doctors From the VA and the Military Wrote
Extensively About TBIs in 2005-06. ............................... 16

      B.   Congress Knew in 2005-06 that IED Blasts in Iraq and
Afghanistan Were Causing TBIs. .................................. 19

IV.   Service Members Are Covered by Federal Traumatic Injury
Protection....................................................................... 22

      A.   Title 38, United States Code, Sets Forth "Veterans'
Benefits" Including TSGLI in Section 1980A................... 22

      B.   Several Million Veterans Rely on TSGLI Protection at
Any Given Time.......................................................... 24

      C.   The VA and the Service Branches Are Responsible for
Directing TSGLI. ........................................................ 24

      D.   The VA's Regulations and a "Procedural Guide" Define
the Circumstances Under Which TSGLI Claims Are
Processed. ................................................................. 28

      E.   TSGLI Is a "Benefit." ................................................... 34

F.      VA's Regulations Require That All Reasonable Doubt Must Be Resolved in Favor of the Veteran When Considering a Claim for Benefits.............................................35

G.      During Rulemaking, VA and DOD Entirely Failed to Consider an Important Aspect of the Traumatic Injury Protection They Were Undertaking to Regulate. ...............................36

    1.      The TSGLI Regulations Identify Only Certain Allegedly "Unique Hazards" From Which Physical Illnesses or Diseases Are Considered Traumatic Injuries. ...................................................36

    2.      IEDs Are Also Unique Hazards of Military Service............................................................40

    3.      IEDs Cause TBIs That Harm Through a Disease Process. ............................................................43

H.      The TSGLI Rulemaking Process Suffered From Additional Flaws. .....................................................47

V.      McKinney's TSGLI Claim Was Wrongfully Denied. ..................................50

A.      McKinney's TSGLI Claim Meets the Requirements that He Sustained a Traumatic Injury Resulting in a Scheduled Loss...........................................................50

    1.      McKinney Claimed a Traumatic Injury That Was Fully Corroborated By His Medical Records and Percipient Witnesses. ..................................51

    2.      McKinney Claimed a Scheduled Loss That Was Fully Corroborated By His Medical Records and Percipient Witnesses. ..................................55

B.      Doctors Agree That the October 9, 2005 Explosion Caused McKinney to Have a TBI. .....................................59

    1.      Dr. DeLeon (Boise VA Medical Center)..................60

    2.      Dr. Morton (Private Practice). ..................................61

3. Dr. Corgiat (Private Practice). ...................................................62

4. Dr. Satovick (Salt Lake City VA Hospital). ............................63

5. Dr. Burns (VA's Salt Lake City Health Care System). ...................................................................................64

C. Concurring Medical Opinions Link McKinney's TBI to His Stroke. ..............................................................................66

1. The Link Between TBIs and Strokes is Now Well-Recognized by the Medical Community. .................................67

2. Recent Medical Opinions Continue to Link McKinney's TBI and His Stroke. .............................................69

D. Army Ultimately Denied McKinney's TSGLI Claim on Narrow Grounds Wholly Inconsistent With VA's Conclusion That McKinney's TBI Caused His Stroke. ......................73

E. Any Reasonable Doubt Should Have Been Resolved in Favor of McKinney. .............................................................80

CAUSES OF ACTION ...........................................................................82

Count I ...................................................................................................82

Count II ..................................................................................................84

Count III.................................................................................................85

REQUESTS FOR RELIEF .....................................................................87

## NATURE OF THE ACTION

1.      This case involves a federal traumatic injury protection benefit known as "TSGLI" that unquestionably helps many wounded warriors, yet is denied to others as a result of flawed agency rulemaking and claim adjudication.  The law providing the TSGLI benefit was rammed through Congress at a time when staggering numbers of service members were sustaining life-altering injuries in Iraq and Afghanistan.  And regulations implementing the TSGLI statutory benefit were hastily put in place without required advance disclosures to the public—including the very service members the law is meant to help—and without due consideration of important aspects of the problem that the law was passed to address.

2.      McKinney served his country on active duty and in the reserves for over two decades.  He is a veteran of the Marine Corps, Navy, and most recently, the Army.  *See* **Ex. 1**.

3.      McKinney is a decorated war hero.  Following two tours of duty in Iraq, he was awarded the Meritorious Service Medal ("MSM") because his "tactical knowledge of combat operations contributed to the success of the armor company to which he was assigned during an overseas deployment in support of Operation Iraqi Freedom III."  The MSM also was awarded because of "[h]is leadership, charisma, and dedication to soldiers"

as well as "selfless service and dedication to duty."  Additionally, the MSM

recognizes McKinney's military career spanning "over 22 years of

meritorious service to our nation."  *See* **Ex. 2**.

4.      For his "duties while being engaged by the enemy . . . during

Operation Iraqi Freedom III," McKinney was awarded the Combat Action

Badge.  *See* **Ex. 3**.

5.      In addition, during his distinguished military career he was

awarded: an Army Commendation Medal, Army Achievement Medal

(awarded twice), Navy Achievement Medal, Army Good Conduct Medal,

Marine Corps Good Conduct Medal, Army Reserve Components

Achievement Medal, Naval Reserve Meritorious Service Medal (awarded

twice), National Defense Service Medal (awarded twice), Iraq Campaign

Medal (2 tours), Global War on Terrorism Service Medal, Humanitarian

Service Medal, Armed Forces Reserve Medal with M Device for

Mobilization, Armed Forces Reserve Medal with hourglass, Army Non-

Commissioned Officer (NCO) Professional Development Ribbon with

Numeral 3, Army Service Ribbon, Army Overseas Service Ribbon, Navy

Sea Service Deployment Ribbon, National Guard Emergency Duty Ribbon,

National Guard Enlistment Ribbon, Idaho Army National Guard Ribbon,

Army Meritorious Unit Citation, and Overseas Service Bar (awarded twice). *See, e.g.,* **Ex. 4**.

6.      On June 29, 2004, McKinney was ordered to active duty in the Idaho Army National Guard in support of Operation Iraqi Freedom. *See* **Ex. 5**.  In late November 2004, he was deployed to Iraq.  He was assigned to the 2-116th Armor Battalion as a platoon sergeant.

7.      While leading a mounted patrol in Kirkuk, Iraq on October 9, 2005, an Improvised Explosive Device ("IED") detonated 15-20 meters from his High Mobility Multipurpose Wheeled Vehicle ("HMMWV"), a.k.a. Humvee.  *See* **Ex. 6-8**.  The IED had been placed near a bridge and attached to a light pole using barbed wire.  *See* **Ex. 7-8**.  When the blast occurred, McKinney was in the left, rear seat of the vehicle, the same side of the vehicle as the explosion from the roadside bomb.  *Id.*  In an unrebutted, sworn statement, the Tactical Commander ("TC") in the vehicle, Staff Sergeant David Gehrig, stated that McKinney "took the brunt of the blast," "seemed to not realize that the blast had come and gone," was "shaken up," "really dazed," and his "mind was [i]n a loop [from] the blast for a few minutes."  *See* **Ex. 7**.

8.      The concussive force of the explosion must have been tremendous; the TC in the Humvee characterized the IED as consisting of

either a 120mm or 155mm artillery round.  *See* **Ex. 7-8**.  Such armament is widely recognized as a high explosive.

9.      According to the concurring medical opinions of at least three physicians from the VA and another two from private practice, McKinney suffered a traumatic brain injury ("TBI") from the concussive force of the explosion.  *See* **Ex. 9-14**.

10.     Despite the stun of the concussive force to McKinney's body, he remained with the men under his command.  McKinney did not seek medical attention at the time, which would have required him to leave his command and travel to a forward operating base ("FOB") in a different area of Iraq from his base in Kirkuk.

11.     Nor was McKinney medically evaluated in the field after the blast for a mild TBI.  There simply was no medic accompanying McKinney's mounted patrol.  Regardless, any such evaluation—had one occurred—would have been unreliable and thus futile as not being based on a TBI screening tool approved by the military at the time.  Indeed, in October 2005, the Army had no protocol for conducting such a medical evaluation in a military operational setting.  Specifically, there was no protocol at that time for identifying potential mild traumatic brain injuries arising from exposure to concussive forces.  *See, e.g.,* **Ex. 10** ("The

["Military Acute Concussion Evaluation] exami[na]tion, however, did not exist on the battlefield in 2005.").

12.     Although the explosion sprayed McKinney's Humvee with shrapnel, dirt, and rocks, *see* **Ex. 7-8**, the debris did not directly impact his body.  Rather, the traumatic event was the external force of the explosion, *i.e.,* the concussive force, which impacted his body due to his close proximity to the blast.

13.     Effective November 18, 2005, McKinney was released from active duty and, effective January 8, 2007, he was honorably discharged from the Idaho Army National Guard.  *See* **Ex. 15-16**.

14.     McKinney resumed his civilian job with the U.S. Postal Service.

15.     On July 21, 2007, at the age of 46, McKinney suffered a left hemispheric, ischemic stroke event, known as a cerebrovascular accident ("CVA").  *See, e.g.,* **Ex. 10, 13**.  Of significance to the present action, that CVA occurred less than 730 days (*i.e.,* two years) after he was exposed at close range to the concussive force of the IED explosion in Kirkuk, Iraq on October 9, 2005.

16.     Initially transported by ambulance to Teton Valley Hospital in Driggs, Idaho on July 21, 2007, McKinney subsequently was admitted to

Eastern Idaho Regional Medical Center on July 22, 2007.  *See, e.g.,* **Ex. 12-13**.  He was discharged on July 30. 2007.  *See, e.g.,* **Ex. 17**.

17.     For more than sixty days commencing with his hospitalization on July 21, 2007, McKinney was unable to independently perform the functions of bathing, continence, dressing, eating, toileting, and transferring (*e.g.,* moving in and out of bed or a chair).  *See, e.g.,* **Ex. 17-20**.

18.     Even after a several month recovery period following the CVA, McKinney was unable to perform rural mail delivery or custodial work to which he subsequently was assigned.  He was medically retired from the U.S. Postal Service.

19.     McKinney's health was robust prior to his deployment.  The VA has acknowledged: "You were in good health prior to the active duty period.  There were no defined risk factors for a stroke."  *See* **Ex. 21**; *concur* **Ex. 13** ("[t]he veteran is not stroke prone" and "[t]he veteran has always been healthy from a medical point of view."); **Ex. 11** ("The patient has no identifiable standard risk factors that would cause stroke or other neurologic deficits.").

20.     During the timeframe relevant to this action, McKinney was covered by United States government life insurance known as Servicemembers' Group Life Insurance ("SGLI").  *See, e.g.,* **Ex. 4**.

21.    SGLI is a group policy procured by the VA on behalf of service members.  38 U.S.C. § 1965 *et seq.*  As will be discussed below, members of the uniformed services covered by the SGLI policy are also insured for certain traumatic injuries separate from loss of life.  The traumatic injury protection, legislated by Congress, is known as "TSGLI" (*i.e.,* Traumatic-SGLI).

22.    McKinney applied for TSGLI benefits arising from his TBI and subsequent loss of ability to independently perform functions of daily living after his TBI-connected stroke.  *See* **Ex. 17**.  The Army, which evaluates his eligibility based on certain criteria set by the VA in consultation with the Department of Defense ("DOD"), has denied his eligibility.  *See* **Ex. 22-24**. The Army's denial is solely based on a demonstrably false conclusion that McKinney's losses were not a result of a qualifying traumatic event (the concussive force of the IED which caused a TBI) but instead merely from a "physical illness" (stroke).  *See* **Ex. 24**.  McKinney's doctors at the VA reached the exact opposite conclusion.  *See* **Ex. 9, 10, 14**.

23.    In justifying the denial, the Army is limited to defending its final position taken during its administrative consideration of McKinney's claim.  The Army's final position amounts to a single sentence.  The Army's position is indefensible.

24.     The TSGLI statute provides an insurance benefit only for "a qualifying loss that results directly from a traumatic injury . . . and from no other cause." 38 U.S.C. § 1980A.  However, the VA's implementing regulation recognizes that some disease processes produce essentially immediate harm but with sequelae[1] and losses that manifest only after an extended latency or delay.  37 C.F.R. § 9.20.  For example, exposure to radiation may cause immediate biological effects such as genetic damage, but radiation-induced cancer and its disabling effects stemming from the radiation "insult" may not occur for quite some time.

25.     Under the VA's regulation, "losses" (*e.g.,* disabilities) due to traumatic injuries caused by *most but not all* physical illnesses or diseases are excluded from coverage.  38 C.F.R. § 9.20(c).  The regulation *does* provide coverage when a scheduled loss results from "a pyogenic infection or physical illness or disease caused by biological, chemical, or radiological weapons or accidental ingestion of a contaminated substance."  37 C.F.R. § 9.20(c) & (e).  The VA considers traumatic injuries from these "unique hazards of military service" to involve a "disease process."  Traumatic Injury Protection Rider to Servicemembers' Group Life Insurance, 70 Fed.

---

[1] "Sequelae refer to negative after-effects of a condition."  *See* http://www.polytrauma.va.gov/definitions.asp#sequelae (last accessed Dec. 22, 2014).

Reg. 75,940 at 42 (Dec. 22, 2005) (interim final rule – Supplementary

Information).  Inexplicably, the VA entirely failed to consider an important

aspect of traumatic injuries when it promulgated the regulation: scheduled

losses *arising from a TBI that harms through physical illness or disease* are

not covered.  Yet, IEDs are "unique hazards of military service" and those

traumatic blast or explosion injuries that are TBIs also involve a "disease

process."

26.     McKinney thus brings this action for a declaratory judgment

that the physical illness and disease exclusions in the Final Rule are

arbitrary, capricious, an abuse of discretion and otherwise not in accordance

with law.

27.     McKinney further brings this action to vacate and set aside the

Army's findings and denial of his eligibility for TSGLI benefits.  Contrary to

the Army's determination, McKinney's losses *were* the result of the

concussive force of the IED which caused a TBI.  As such, McKinney's

losses are covered by the insurance policy.  Moreover, the Army applied

improper adjudicatory standards in assessing McKinney's claim.  To the

extent that there was any reasonable doubt, it should have been resolved in

McKinney's favor.  It clearly was not.  McKinney sues for a declaration that

he has met the requirements for TSGLI benefits eligibility for the period

beginning July 21, 2007 and ending September 30, 2007, based on his inability to independently perform activities of daily living, *viz.* bathing, continence, dressing, eating, toileting, and transferring, during that timeframe.

## THE PARTIES

28.     Plaintiff Hugh Campbell McKinney is a disabled veteran of Operation Iraqi Freedom with a home address of 5985 S 45th E, Idaho Falls, ID 83406.  He has been married for 25 years and has five children.

29.     Defendant United States Department of Veterans Affairs is a federal agency headquartered at 810 Vermont Avenue NW, Washington, DC 20420.

30.     Defendant United States Department of Defense is a federal agency headquartered at 1400 Defense Pentagon, Washington, DC 20301-1400.

31.     Defendant United States Army is a federal agency headquartered, and with its Office of the Deputy Chief of Staff, G-1, at 300 Army Pentagon, Washington, DC 20310-0300.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over this action pursuant to 38 U.S.C. § 1975 (Servicemembers' Group Life Insurance).

33.     This Court also has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

34.     Jurisdiction further exists under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2).

35.     In addition, this Court has jurisdiction under 28 U.S.C. § 1361 which grants district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

36.     This Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 & 2202.

37.     Venue lies in this District due to 28 U.S.C. § 1391(e)(1)(A).

38.     The VA is a federal agency headquartered in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  The VA is the policyholder of Group Policy No. G-32000 issued by The Prudential Insurance Company of America ("Prudential") which concerns, *inter alia*, SGLI in connection with which TSGLI is provided for service members.  *See* 38 U.S.C. § 1966 *et seq.*; 38 U.S.C. § 1980A ("[a] member of the uniformed services who is insured under [SGLI] shall automatically be insured for traumatic injury"); Prudential Group Policy No. G-32000, as amended, **Ex. 25**.

39.     In collaboration with DOD, the VA manages the TSGLI

program and promulgates the rules for determining eligibility for the

payment of insurance benefits for certain traumatic injuries resulting in

certain losses suffered by service members.  *See, e.g.,* 38 U.S.C. § 1980A(a),

(b)(1), (b)(3), & (d)(1); *see also* 38 U.S.C. §§ 301(b), 303.

40.     A service member's branch of service—in this case the Army—

certifies the eligibility of its member to receive traumatic injury protection

benefits.  *See* 38 U.S.C. § 1980A(f); 37 C.F.R. § 9.20(f).

## BACKGROUND AND ALLEGATIONS

## I.     TBIs Are a Signature Wound From Serving in Iraq and Afghanistan.

41.     Since at least the early days of the war in Iraq, TBI has been

called an "invisible wound" of modern warfare.  *See, e.g.,* Judy Muller,

*More Troops Returning From Iraq With Brain Trauma.  Soldiers From Iraq*

*Must Undergo Extensive Rehab*, ABC NEWS, Oct. 8, 2004, *available at*

http://abcnews.go.com/Health/print?id=145001.[2]

42.     By early 2005, the gravity of the situation faced by service

members exposed to IED blasts in Iraq and Afghanistan was readily

apparent:

---

[2] All content on the internet cited in this Complaint was last accessed
Dec. 22, 2014.

> A growing number of U.S. troops whose body armor helped them survive bomb and rocket attacks are suffering brain damage as a result of the blasts. It's a type of injury some military doctors say has become the signature wound of the Iraq war.

Gregg Zoroya, *Key Iraq Wound: Brain Trauma*, USA TODAY, Mar. 3, 2005, *available at* http://usatoday30.usatoday.com/news/nation/2005-03-03-brain-trauma-lede_x.htm.

43. By 2005, it was recognized that "TBI appears to account for a larger proportion of casualties than it has in other recent U.S. wars." *See* S. Okie, *Traumatic Brain Injury in the War Zone*, 352 THE NEW ENGLAND JOURNAL OF MEDICINE 2043 (2005). "So many who survive explosions - more than half - sustain head injuries that doctors say anyone exposed to a blast should be checked for neurological problems. Brain damage, sometimes caused by skull-penetrating fragments, sometimes by shock waves or blows to the head, is a recurring theme." Denise Grady, *Struggling Back From War's Once-Deadly Wounds*, THE NEW YORK TIMES, Jan. 22, 2006. "Brain injuries — the signature wounds inflicted by the blast waves and flying shrapnel of explosives — are pervasive." Erik Eckholm, *A New Kind of Care in a New Era of Casualties*, THE NEW YORK TIMES, Jan. 31, 2006.

44.   In 2005, there was no accepted, systematic approach for evaluating a service member for a TBI in military operational settings.  It was not until 2006 that a TBI screening tool called the Military Acute Concussion Evaluation ("MACE") was developed by the military's Defense and Veterans Brain Injury Center ("DVBIC").  *See, e.g.,* DEFENSE AND VETERANS BRAIN INJURY CENTER: HISTORY, *available at* http://dvbic.dcoe.mil/history.  And it was not until late in 2006 that DVBIC released a "Clinical Practice Guideline and Recommendations" in which mild TBI screening of service members with the MACE tool was recommended in military operational settings, *i.e.* in theatre.  *See* http://www.pdhealth.mil/downloads/clinical_practice_guideline_recommend ations.pdf.  The MACE assessment emerged with the realization that "[t]raumatic brain injury (TBI), in both times of peace and times of war is a significant public health issue for the military."  *See* Louis French et al., *The Military Acute Concussion Evaluation (MACE)*, 8 JOURNAL OF SPECIAL OPERATIONS MEDICINE 68 (2008), *available at* http://www.socom.mil/JSOMDocs/2008168French.pdf.

## II.   TBIs Are Widespread Among Service Members Who Served in Iraq and Afghanistan.

45.   Over about 15 years—from the year 2000 through the third quarter of 2014—the DVBIC, part of the U.S. military health system,

documented more than three hundred thousand medical diagnoses of TBI worldwide among U.S. defense forces.  *See* DOD NUMBERS FOR TRAUMATIC BRAIN INJURY.  WORLDWIDE – TOTALS, DVBIC, 2014, *available at* http://dvbic.dcoe.mil/sites/default/files/DoD-TBI-Worldwide-Totals-2000-2014-Q1-Q3-Dec1-2014.pdf; *see also* http://dvbic.dcoe.mil/about-dvbic-traumatic-brain-injury-tbi.  Of those documented cases, on the order of 50-60 thousand service members received their TBIs while in a deployed setting.  *See* http://dvbic.dcoe.mil/dod-worldwide-numbers-tbi (noting that over 80% of the TBIs occurred in a non-deployed setting).

46.     It is widely believed, however, that estimates of TBI among service members are conservative.  In August 2007, the DOD's Armed Forces Health Surveillance Center noted that the incidence rates of TBI documented in the military "likely represent the tip of the iceberg of overall TBI-related morbidity among U.S. service members."  *See Traumatic Brain Injury among Members of Active Components, U.S. Armed Forces, 1997-2006*, 14 MEDICAL SURVEILLANCE MONTHLY REPORT 2 (published by the Armed Forces Health Surveillance Center) (2007).  Similarly, a RAND study in 2008 reported that "most individuals who experienced a TBI" during Operation Enduring Freedom ("OEF") and Operation Iraqi Freedom ("OIF") "have not been evaluated by a doctor to determine the extent of the

injuries" and cautioned that studies may "underestimate the actual prevalence." *See* Terri Tanielian & Lisa H. Jaycox, Eds., INVISIBLE WOUNDS OF WAR: PSYCHOLOGICAL AND COGNITIVE INJURIES, THEIR CONSEQUENCES, AND SERVICES TO ASSIST RECOVERY, RAND, Santa Monica, 2008, at 56, 112, 434-35, *available at*

http://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG720.pdf.

47.    The problem of TBIs became so acute and urgent during the wars in Iraq and Afghanistan that the Army actually started equipping soldiers' helmets and vehicles with sensors to record data on blast effects. *See, e.g.,* Scott R. Gourley, *Soldier Armed.  Helmet Sensors*, ARMY, Aug. 2013, at 59, *available at* http://www.ausa.org/publications/armymagazine/archive/2013/08/documents/soldierarmed_August2013.pdf.

## III.    The Executive and Legislative Branches Were Well-Aware of the Incidence of TBIs When Federal Traumatic Injury Protection Was Created.

### A.    Doctors From the VA and the Military Wrote Extensively About TBIs in 2005-06.

48.    Before the TSGLI law and regulations, the veterans and military health care communities gained increasing awareness and concern about IEDs and resulting brain injuries from the war in Iraq.

49.     In a 2005 research paper in *The New England Journal of Medicine*, physicians from the Veterans Health Administration (a component of the VA) as well as the Uniformed Services University of the Health Sciences (the nation's federal health sciences university and the "academic heart" of the Military Health System) reviewed the causes and effects of blast injuries.  Ralph G. DePalma et al., *Blast Injuries*, 352 THE NEW ENGLAND JOURNAL OF MEDICINE 1335 (2005).  The physicians characterized "[i]mprovised explosive devices currently used in insurgency warfare in Iraq" as being "particularly challenging." *Id.* at 1335.

50.     "The blast wave consists of two parts — a shock wave of high pressure, followed closely by a blast wind, or air in motion." *Id.* at 1335. "Primary blast injuries are caused by barotrauma — either overpressurization or underpressurization relative to atmospheric pressure." *Id.* at 1336.  A telltale sign of barotrauma, indicating that an individual suffered primary blast injuries, is rupture of the eardrum which may be manifested by tinnitus (*e.g.,* hearing ringing in the ears) or vertigo (*e.g.,* dizziness). *Id.*

51.     The central nervous system—which includes the brain—can be impacted by the blast:

> Primary blast injuries to the brain include concussion as well as barotrauma caused by acute

> gas embolism. Loss of consciousness and coup
> and contrecoup injuries formerly were considered
> secondary or tertiary injuries, but with the
> increased use of body armor in the military,
> damage to the central nervous system after an
> explosion has been increasingly attributed to the
> direct effects of the blast. Serious late effects of
> traumatic brain injuries, such as central nervous
> system residua, have brought attention to the need
> for rehabilitation of the central nervous system
> after blast exposure.

*Id.* at 1337.

52.     Writing in 2006 while the VA was still finalizing the TSGLI

regulations, a military doctor from the DVBIC at Walter Reed Army

Medical Center reported:

> Although penetrating brain injuries are more
> readily identified, closed brain injuries occur more
> commonly. Explosion or blast injury is the most
> common cause of war injuries.

Deborah Warden, *Military TBI During the Iraq and Afghanistan Wars*, 21

JOURNAL OF HEAD TRAUMA REHABILITATION 398 (2006). She concluded:

> Clearly, TBI is an important issue for the wars in
> Iraq and Afghanistan. Although penetrating brain
> injuries have always been associated with war,
> frequent occurrence of closed brain injury in this
> war is increasingly acknowledged. One source
> stated that the number of serious brain injuries is
> approximately 5 times the number of amputees.
> Possible reasons for an increase in closed TBI
> include the effectiveness of body armor in saving
> those who would have been killed previously,
> increased identification of closed TBI due to

> increased understanding of the potential sequelae
> of mild and moderate closed brain injury, and the
> prominence of blast as an injury mechanism.

*Id.* at 400-01 (citations omitted).

> **B.      Congress Knew in 2005-06 that IED Blasts in Iraq and
> Afghanistan Were Causing TBIs.**

53.      In the years surrounding the introduction of TSGLI, Congress

was also well aware of the extent of brain injuries sustained by service

members in combat.

54.      By the time American boots hit the ground in OEF in

Afghanistan and then in OIF in Iraq, Congress had long been aware of the

need to address the growing demands of a veteran population suffering from

TBIs sustained in service.  A decade before, in the early 1990s as the Persian

Gulf War concluded, the Defense and Veterans Head Injury Program was

born after Congress supported "an initiative for DOD victims of head and

neck injuries."  *See, e.g.,* Conference Report on H.R. 2521, the Defense

Appropriations Act for Fiscal Year 1992, 102 H. Rpt. 328 (Nov. 18, 1991).

The chairman of a previous, federal Interagency Head Injury Task Force

already had labeled TBI as a "silent epidemic."  Murray Goldstein,

*Traumatic Brain Injury: a Silent Epidemic*, 27 ANNALS OF NEUROLOGY 327

(1990).

55.     In 2004, Congress and the public knew the terrible

consequences of IEDs encountered by service members in Iraq.  The

*Washington Post* reported:

> . . . [I]nsurgents began planting improvised
> explosive devices (IEDs) in what one officer called
> ''ridiculous numbers.''
>
> The improvised bombs are extraordinarily
> destructive.   Typically fashioned from artillery
> shells, they may be packed with such debris as
> broken glass, nails, sometimes even gravel.
> They're detonated by remote control as a Humvee
> or truck passes by, and they explode upward.
>
> \*   \*   \*
>
> ''We were clearing the area and an IED
> went off,'' [one soldier] said . . .
>
> [He] counted himself lucky, escaping with a
> concussion . . . What he most wanted was to return
> to his unit.

Karl Vick, *The Lasting Wounds of War; Roadside Bombs Have Devastated*

*Troops and Doctors Who Treat Them*, WASHINGTON POST, Apr. 27, 2004, at

A01, *available at* http://www.washingtonpost.com/wp-dyn/articles/A44839-

2004Apr26.html.

56.     Referencing that article while introducing legislation in June

2004, Senator Bob Graham stated:

> Blasts from such weapons as artillery, mortar
> shells, and roadside bombs—improvised
> explosives . . . have become the most common
> mechanism of injury in modern warfare.   The
> resulting injuries include those to . . . quite
> commonly, the head.

150 Cong. Rec. S6886 (June 16, 2004) (statement of Sen. Bob Graham

introducing legislation for the VA to establish a War-Related Blast Injury

Center, later codified at 38 U.S.C. § 7327).

57.    The devastating effects of IEDs weighed heavily on the

collective mind of Congress in the years leading up to passage of the

traumatic injury protection legislation.  Indeed, IEDs were discussed in 124

entries in the Congressional Record from the start of Operation Enduring

Freedom, October 7, 2001, through the President's signing of the TSGLI law

on May 11, 2005.  *See* **Ex. 26**.  Of those, there were dozens of tributes to

fallen heroes whose lives were lost when an IED exploded.  *Id.*  Similarly,

traumatic brain injuries were discussed in 103 entries during that timeframe.

*See* **Ex. 27**.

58.    Well-aware of the escalating problem of service-connected

TBIs in 2005, Congress pursued traumatic injury protection legislation with

a passion for those who put themselves in harm's way and were harmed:

> [W]e must be vigilant in our care for those who are
> still fighting to regain the normalcy of the lives
> they enjoyed prior to sustaining catastrophic
> injuries in the defense of our freedoms.

151 Cong. Rec. S4095 (April 21, 2005) (statement of Sen. Craig).

59.    The traumatic injury protection was aimed to provide a

"financial cushion" to the injured service member and, indirectly, their

caregivers because "family members of injured soldiers bear the burdens" too. *Id.*

## IV. Service Members Are Covered by Federal Traumatic Injury Protection.

### A. Title 38, United States Code, Sets Forth "Veterans' Benefits" Including TSGLI in Section 1980A.

60.     The Servicemen's Group Life Insurance Act, passed in 1965, provides group term life insurance for members in the uniformed services. Pub. L. No. 89-214, 79 Stat. 880 (1965).  The law was enacted "to provide special indemnity insurance for members of the Armed Forces serving in combat zones, and for other purposes." *Id.*  Codified at 38 U.S.C. § 1965 *et seq.* and later renamed *Servicemembers'* Group Life Insurance, *see* Pub. L. No. 104-275, 110 Stat. 3339 (1996), Congress has gradually expanded the insurance coverage over the nearly fifty years of its existence.

61.     With about one page of legislative history published in the Congressional Record on April 21, 2005, the traumatic injury protection law was passed by Congress and then signed by the President on May 11, 2005, becoming effective December 1, 2005.  *See* 151 CONG. REC. S4094 (Apr. 21, 2005) (statement of Sen. Craig); Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, 119 Stat. 257, 260 (2005).  Although not

itself life insurance, the traumatic injury protection is commonly known as Traumatic Servicemembers' Group Life Insurance, a.k.a. TSGLI.  *See, e.g.,* National Defense Authorization Act for Fiscal Year 2008, Pub. Law. 110-181, 122 Stat. 495 (2008).  TSGLI is codified at 38 U.S.C. § 1980A.

62.     Originally conceived in 2005 as a "rider" to the SGLI policy, 119 Stat. 257, technical and clarifying amendments to the statute in 2006 dropped the "rider" design and instead simply required that "[a] member of the uniformed services who is insured under [SGLI] shall automatically be insured for traumatic injury" under 38 U.S.C. § 1980A.  *See* Veterans' Housing Opportunity and Benefits Improvement Act of 2006, Pub. L. 109-233, 120 Stat. 397, 4 11 (2006); 38 U.S.C. § 1980A(a)(1).

63.     There is no insurance policy *per se* for TSGLI.  The "insurance benefits" (38 U.S.C. § 1980A(a)(1) specifically uses this term) are provided solely by statute and paid by the federal government, which funds the traumatic injury protection in small part by collecting premiums from service members.

64.     TSGLI "provides for the payment of a specified benefit amount to a member insured by [SGLI] who sustains a traumatic injury directly resulting in a scheduled loss."  38 C.F.R. §9.20(a).

**B.      Several Million Veterans Rely on TSGLI Protection at Any
          Given Time.**

65.      Originally, Congress provided retroactive traumatic injury

protection for the period October 7, 2001 through and including November

30, 2005 for injuries incurred only in Operation Enduring Freedom ("OEF")

or Operation Iraqi Freedom ("OIF").  38 U.S.C. § 1980A (note); 119 Stat.

259-60.  Congress later expanded the retroactivity to cover injuries during

that period irrespective of whether they occurred in OEF/OIF.  Veterans'

Benefits Act of 2010, Pub. L. No. 111-275, 124 Stat. 2881 (2010).

66.      For the policy year ending June 30, 2014, there were about

2,221,000 service members covered under TSGLI.  *See* SERVICEMEMBERS'

AND VETERANS' GROUP LIFE INSURANCE PROGRAMS, FORTY-NINTH ANNUAL

REPORT, YEAR ENDING JUNE 30, 2014, Department of Veterans Affairs,

Veterans Benefits Administration Insurance Center, Philadelphia, at 6, **Ex.**

**28**.

**C.      The VA and the Service Branches Are Responsible for
          Directing TSGLI.**

67.      The express purpose of the VA "is to administer the laws

providing benefits and other services to veterans."  38 U.S.C. § 301(b).  The

Secretary of Veterans Affairs "is responsible for the proper execution and

administration of all laws administered by [the VA] and for the control,

direction, and management of [the VA]." 38 U.S.C. § 303.  The VA's

headquarters, and its Secretary, are located in Washington, D.C.

68.     The Secretary of Veterans Affairs, in consultation with the

Secretary of Defense, prescribes the regulations specifying the traumatic

injuries and associated qualifying losses covered by TSGLI.  38 U.S.C. §

1980A(b)(1), (j); 70 Fed. Reg. 75,940.  Moreover, the Secretary of Veterans

Affairs, in consultation with the Secretary of Defense, promulgates the

"regulations providing the condition under which coverage against a

scheduled loss will not be provided by TSGLI."  70 Fed. Reg. at 75,942

(interim final rule – Supplementary Information); 38 U.S.C. § 1980A(b)(3),

(j).

69.     The VA also is responsible for proposing legislation or

regulations for changes to the TSGLI Program, providing oversight of

OSGLI's operations, conducting consistency reviews of Branch of Service

decisions concerning claims, and conducting outreach regarding the TSGLI

benefit.  *See* TRAUMATIC INJURY PROTECTION UNDER SERVICEMEMBERS'

GROUP LIFE INSURANCE, U.S. Dept. of Veterans Affairs, Oct. 28, 2013, *at*

http://rwtf.defense.gov/Portals/22/Documents/Meetings/m17/011tsgli.pdf,

**Ex. 29**.

70.     The Branches of Service are responsible for establishing offices to process TSGLI claims, determining eligibility for TSGLI benefits, developing a formal claims appeal process, and conducting outreach to service members and the military medical community.  *Id.*

71.     The VA contracts with a private entity—Prudential, which also happens to be the insurer that issued the SGLI group policy to the U.S. government—to handle certain administrative aspects of TSGLI under an Administrative Services Agreement.  *See* Administrative Services Agreement No. 32000 between the VA and Prudential, effective Dec. 1, 2005, at 4, **Ex. 30**.  Largely, the administrative services focus on issuing TSGLI payments or denial letters based on Branch of Service TSGLI decisions as well as providing accounting reports.  *Id.* at 8-10; *see also* **Ex. 29**.

72.     Aside from premiums paid by service members, the federal government essentially assumes all financial risk associated with TSGLI.  38 U.S.C. § 1975A(e)(6) ("The cost attributable to insuring members . . . less the premiums paid by the members . . . shall be paid by the [uniformed service] Secretary concerned to the Secretary [of the VA].").  Under the "administrative services only" arrangement in which benefits are disbursed

by Prudential, it is the responsibility of the VA to "provide all funds for any benefits determined to be payable . . . and the cost of all services." **Ex. 30**.

73.    "One of VA's main roles in the implementation of TSGLI is the development of procedures and issuance of guidance for handling claims to the branches of service.  A detailed TSGLI Procedural Guide was developed for all uniformed service TSGLI points of contact.  The guide explains all aspects of TSGLI, including premiums, coverage, exclusions, and other eligibility criteria. . . ."  *See* "Prepared Statement of Thomas Lastowka, Director, Insurance Service, Veterans Benefits Administration, Department of Veterans Affairs," HEARING ON WOUNDED WARRIOR INSURANCE: A FIRST LOOK AT A NEW BENEFIT FOR TRAUMATICALLY INJURED SERVICEMEMBERS. Hearing before the Committee on Veterans' Affairs, United States Senate, 109th Congress, 2d Session, S. HRG. 109–746, Sept. 7, 2006, at 15, *available at* http://www.gpo.gov/fdsys/pkg/CHRG-109shrg31336/pdf/CHRG-109shrg31336.pdf ("S. HRG. 109–746").

74.    "In accordance with the legislation, VA has taken the lead on decisions relating to program policies and standards.  On issues of disagreement on policies affecting certification decisions, VA makes the final determination with input from all parties.  In contrast, VA has left the

internal procedures for claims processing to the uniformed services to handle as they see fit. . . ."  *Id.*

75.     Within the Army, the TSGLI Program is administered by the U.S. Army Human Resources Command ("HRC"), Fort Knox, Kentucky. HRC is a field operating agency of the Office of the Deputy Chief of Staff for Personnel, G-1 ("Army G-1"), Department of the Army, located at 300 Army Pentagon, Washington, DC 20310-0300.  *See, e.g.,* https://www.hrc.army.mil/STAFF/HRC%20History.  The Army G-1 develops, manages, and executes all manpower and personnel plans, programs, and policies of the Army.  *See, e.g.,* http://www.armyg1.army.mil/.

**D.     The VA's Regulations and a "Procedural Guide" Define the Circumstances Under Which TSGLI Claims Are Processed.**

76.     The traumatic injury benefit provides "monetary assistance to help the [service] member and the member's family through an often long and arduous treatment and rehabilitation period."  70 Fed. Reg. 75,940 (interim final rule – Supplementary Information).  "TSGLI is designed to help traumatically injured Servicemembers and their families with financial burdens associated with recovering from a severe injury.  TSGLI payments range from $25,000 to $100,000 based on the qualifying loss suffered."  TRAUMATIC INJURY PROTECTION UNDER SERVICEMEMBERS' GROUP LIFE

INSURANCE (TSGLI): A PROCEDURAL GUIDE, VA Insurance Service, Dep't

of Veterans Affairs, Version 2.26, Oct. 27, 2014, at 4, *available at*

http://www.benefits.va.gov/INSURANCE/docs/TSGLIProceduresGuide.pdf,

**Ex. 33** (hereinafter, "VA's TSGLI PROCEDURAL GUIDE").

77.     "The TSGLI office for the member's branch of service certifies

TSGLI claims" and follows the claim review process set forth in the VA's

TSGLI PROCEDURAL GUIDE.  *Id.* at 48.  That document includes a section for

"certifying officials" entitled "Certifying a Claim for TSGLI," which sets

forth the "framework to determine if the loss is found or not found."  *Id.* at

48-58.

78.     If the certifying official determines that the loss does not meet

the requirements for TSGLI payment, then the official chooses at least one

"loss disposition code" corresponding to any of seventeen separate reasons

for nonpayment of a claimed loss.  *Id.* at 49-50.

79.     "All members covered under SGLI who experience a ***traumatic***

***event*** that directly results in a ***traumatic injury*** causing a ***scheduled loss***

defined under the program are eligible for TSGLI payment."  *Id.* (emphasis

in original).

80.     The traumatic event need not occur in battle let alone a war

zone.  A wide-array of traumatic events can fall within the TSGLI

- 29 -

protection, *e.g.,* "an airplane crash, a fall in the bathtub, or a brick that falls and causes a sudden blow to the head" or even "heat stroke after collapsing during a physical training run in scorching temperatures." *Id.* at 4.

81.     Pursuant to the VA's regulations, "[a] ***traumatic event*** is the application of ***external force***, violence, chemical, biological, or radiological weapons, or accidental ingestion of a contaminated substance causing damage to a living being."  38 C.F.R. § 9.20(b)(1) (emphasis added).

82.     According to the VA's regulations, "[a] ***traumatic injury*** is physical damage to a living body that is caused by a traumatic event" but "the term 'traumatic injury' ***does not include*** damage to a living body caused by," *inter alia*, "physical illness or disease, ***except*** if the physical illness or disease is caused by a pyogenic infection, biological, chemical, or radiological weapons, or accidental ingestion of a contaminated substance."  38 C.F.R. § 9.20(c)(1) & (2) (emphasis added).  In adopting this exclusion to an exclusion, the VA provided the following rationale:

> We have defined "traumatic injury" in § 9.20(c)(2)(ii) to include physical illness or disease caused by a pyogenic infection, chemical, biological, or radiological weapons, or accidental ingestion of a contaminated substance because including immediate traumatic harm due to those ***unique hazards of military service*** is consistent with the purpose of TSGLI.  Because the process by which such hazards produce immediate harm may be characterized as a ***disease process***, we

> specify in § 9.20(c)(2)(ii) that diseases resulting from those hazards are within the definition of "traumatic injury."

70 Fed. Reg. at 75,942 (interim final rule – Supplementary Information) (emphasis added).

83.    "[A]ll traumatic injuries will be considered to have occurred at the same time as the traumatic event."  38 C.F.R. § 9.20(c)(3).

84.    In prescribing the TSGLI regulations, the VA acknowledged that "it is difficult to determine with any accuracy the time period within which loss due directly to the traumatic injury can be expected to occur."  70 Fed. Reg. at 75,942 (interim final rule – Supplementary Information).

85.    The TSGLI regulations were initially set forth in an "interim final rule" under 5 U.S.C. § 553(b)(3)(B), issued without prior public comment on December 22, 2005.  The VA stated that it was "impracticable to delay this regulation for the purpose of soliciting prior public comment" because traumatic injury protection under the TSGLI law—enacted on May 11, 2005—already became effective earlier that month on December 1, 2005.  70 Fed. Reg. at 75,944 (interim final rule – Administrative Procedure Act).

86.    According to the interim final rule, "[t]raumatic injury protection under SGLI (TSGLI) is modeled after commercial Accidental

Death and Dismemberment (AD&D) insurance coverage, specifically, the

'dismemberment' portion of the coverage."  70 Fed. Reg. 75,940 (interim

final rule – Supplementary Information).  The VA explained:

> [T]hese rules implementing the TSGLI program
> are based on commercial AD&D policies, which
> have a successful track record, because TSGLI is a
> rider to a group life insurance policy purchased
> from a commercial life insurance company and
> because AD&D policies are frequently provided as
> a rider to a commercial life insurance policy.

*Id.*

87.    After apparently receiving just a single comment during the 30

day period following publication of the interim final rule, the VA adopted a

final rule in which it "increase[d] the period after a traumatic injury within

which a scheduled loss must occur, from the current 365 days to 2 years."

Traumatic Injury Protection Rider to Servicemembers' Group Life

Insurance, 72 Fed. Reg. 10,362 (Mar. 8, 2007) (final rule – Supplementary

Information).  The lone comment was from the very organization that had

lobbied Congress to pass the TSGLI legislation in the first place, the

Wounded Warrior Project.  *See* **Ex. 31**.

88.    In Section 1980A of Title 38, Congress specifically provides

that qualifying losses shall include "inability to carry out the activities of

daily living resulting from traumatic injury to the brain."  38 U.S.C. §

1980A(b)(1)(H).  The traumatic injury protection statute defines the term "inability to carry out the activities of daily living" as meaning "the inability to independently perform two or more of the following six functions": bathing, continence, dressing, eating, toileting, and transferring (each, hereinafter, an "ADL").  Thus, according to the VA's regulations, a "*scheduled loss*" includes a traumatic brain injury resulting in inability to perform at least two ADLs for a minimum of 15 days.  38 C.F.R. § 9.20(f)(17).

89.    "The scheduled loss may occur subsequent to the date of termination of duty status in the uniformed services, provided it is within two years of the traumatic event."  VA'S TSGLI PROCEDURAL GUIDE, **Ex. 33** at 6.

90.    TSGLI benefits associated with a TBI are paid in increments of $25,000 for the loss of at least two ADLs extending to each of 15, 30, 60, and 90 consecutive days.  *Id.*  The maximum insurance benefit is $100,000. 38 C.F.R. § 9.20(e).

91.    TSGLI coverage extends retroactively to traumatic events occurring from October 7, 2001 through November 30, 2005 "if the scheduled loss is a direct result of a traumatic injury incurred in Operation Enduring Freedom or Operation Iraqi Freedom."  38 C.F.R. § 9.20(b)(1)(2).

### E.    TSGLI Is a "Benefit."

92.    The TSGLI statute falls within Title 38 (Veterans' Benefits). As such, it does not fall within the statutes regulating the uniformed services, *i.e.,* the Army.

93.    Congress considers TSGLI to be a benefit.  According to the TSGLI statute, a service member who sustains a traumatic injury that results in a qualifying loss is entitled to federal "insurance benefits."  38 U.S.C. § 1980A(a)(1).  The uniformed services certify whether a "claim for benefits" meets the requirements for a qualifying loss.  38 U.S.C. § 1980A(f).

94.    Moreover, the VA characterizes TSGLI as a benefit.  The VA entered into Administrative Services Agreement No. 32000 so that Prudential would provide certain services in connection with the "Plan of Benefits" defined by the TSGLI statute and regulations.  *See* **Ex. 30**.  The contract refers, *inter alia*, to "TSGLI benefits," "traumatic injury protection benefits," "eligibility for benefits," "qualifications for benefits," "entitlement to benefits," "claims for benefits," and "funds for any benefits determined to be payable."  *Id.*

**F.     VA's Regulations Require That All Reasonable Doubt Must Be Resolved in Favor of the Veteran When Considering a Claim for Benefits.**

95.     The TSGLI statute confers authority over benefit claims to the Secretary of Veterans Affairs, and the Secretary has delegated that authority to the heads of each individual branch of service.  38 C.F.R. § 9.20(g).

96.     The VA's TSGLI PROCEDURAL GUIDE, which governs the Army's claim review process, does not set forth any legal burden of proof by which TSGLI claims are to be evaluated.

97.     Pursuant to 38 C.F.R. § 3.102, the VA's regulations require that all reasonable doubt be resolved in favor of a veteran-claimant:

> It is the defined and consistently applied policy of the Department of Veterans Affairs to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. ***When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant.*** By reasonable doubt is meant one which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim.  It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility.  It is not a means of reconciling actual conflict or a contradiction in the evidence.  Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not

> justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete record otherwise warrants invoking this doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions, and is consistent with the probable results of such known hardships.

98.    "The reasonable doubt standard has been a consistent fixture of the VA claims process since the 1850s.  There has been little criticism of the standard."  HONORING THE CALL TO DUTY: VETERANS' DISABILITY BENEFITS IN THE 21ST CENTURY.  Veterans' Disability Benefits Commission, Washington, DC, Oct. 2007 at 102, *available at*

http://www.tricare.mil/tma/ocmo/download/Exec_Summary/ES-9_HonoringCallDuty_VADisabilityBenefitCommission.pdf.

**G.    During Rulemaking, VA and DOD Entirely Failed to Consider an Important Aspect of the Traumatic Injury Protection They Were Undertaking to Regulate.**

**1.    The TSGLI Regulations Identify Only Certain Allegedly "Unique Hazards" From Which Physical Illnesses or Diseases Are Considered Traumatic Injuries.**

99.    The regulations promulgated by the VA in collaboration with DOD, and implemented by the Army, broadly deny TSGLI coverage for those traumatic injuries and scheduled losses involving damage to a living body caused by "physical illness or disease."  However, coverage is ***not***

denied if the physical illness or disease is caused by: a pyogenic infection, biological, chemical, or radiological weapons, or accidental ingestion of a contaminated substance (collectively, "Enumerated Exemptions") as set forth in 38 C.F.R. §§ 9.20(c) & (e)(4).

100.   According to the VA, the Enumerated Exemptions are special circumstances eligible for TSGLI payments because "including immediate traumatic harm due to those unique hazards of military service is consistent with the purpose of TSGLI" and "the process by which such hazards produce immediate harm may be characterized as a disease process."  70 Fed. Reg. at 75,941 (interim final rule – Supplementary Information).  Yet inexplicably absent from the enumerated exemptions is physical illness or disease caused by explosive ordnance, *e.g.,* an IED, which also is a unique hazard of military service and also produces immediate harm, *e.g.,* to the brain, that may be characterized as a disease process just like the Enumerated Exemptions.

101.   First among the Enumerated Exemptions, the TSGLI regulation defines "pyogenic infection" as "a pus-producing infection."  38 C.F.R. §§ 9.20(e)(6)(vii).  The VA explained in its interim final rule that such an infection "is likely to occur as a result of injuries, *i.e.,* wounds, that are

incurred under military conditions."  70 Fed. Reg. at 75,942 (interim final rule – Supplementary Information).

102.   The potential latency of pyogenic infection has long been recognized.  For example, in the late nineteenth century, medical practitioners documented a cerebral abscess cyst lasting for a latent period of "many months" to "some years" before a "fresh attack of infective inflammation."  Sir William Macewen, PYOGENIC INFECTIVE DISEASES OF THE BRAIN AND SPINAL CORD.  MENINGITIS.  ABSCESS OF BRAIN.  INFECTIVE SINUS THROMBOSIS. James Maclehose and Sons, Glasgow, 1893, at 181.

103.   More recently, pyogenic liver abscess has been found to present an elevated risk of cancer even five years after occurrence.  *See, e.g.,* W.-Y. Kao et al., *Cancer Risk In Patients With Pyogenic Liver Abscess: A Nationwide Cohort Study*, 36 ALIMENTARY PHARMACOLOGY AND THERAPEUTICS 467 (2012).

104.   Second among the Enumerated Exemptions, the TSGLI regulation defines "chemical weapon" as "chemical substances intended to kill, seriously injure, or incapacitate humans through their physiological effects."  38 C.F.R. §§ 9.20(e)(6)(ix).

105.   For example, a causal relationship has been found between exposure to mustard gas—a potent chemical agent—and incidence of cancer

and leukemia *within a decade*.  *See* VETERANS AT RISK: THE HEALTH

EFFECTS OF MUSTARD GAS AND LEWISITE.  Institute of Medicine, National

Academy Press, Washington, DC, 1993, at 4, 218.

106.   Third among the Enumerated Exemptions, the TSGLI

regulation defines "biological weapon" as "biological agents or

microorganisms intended to kill, seriously injure, or incapacitate humans

through their physiological effects."  38 C.F.R. §§ 9.20(e)(6)(x).

107.   For example, following exposure to the organism *Burholderia*

*pseudomallei*—considered a potential biological warfare threat agent—an

infectious disease called melioidosis "can reactivate years after primary

infection and result in chronic and life-threatening disease."  USAMRIID'S

MEDICAL MANAGEMENT OF BIOLOGICAL CASUALTIES HANDBOOK.  FOURTH

EDITION.  U.S. Army Medical Research Institute of Infectious Diseases

(USAMRIID), Fort Detrick, Maryland, Feb. 2001, at 31, *available at*

http://www.dtic.mil/dtic/tr/fulltext/u2/a416772.pdf.

108.   Fourth among the Enumerated Exemptions, the TSGLI

regulation defines "radiological weapon" as "radioactive materials or

radiation-producing devices intended to kill, seriously injure, or incapacitate

humans through their physiological effects."  38 C.F.R. §§ 9.20(e)(6)(xi).  It

is beyond dispute that "[t]he biological effects of radiation may become

manifest within hours, days, or several weeks, or may take years or even decades to become evident." James M. Woolfenden & John B. Sullivan, Jr., *Radiation and Radioactive Emergencies, in* CLINICAL ENVIRONMENTAL HEALTH AND TOXIC EXPOSURES. SECOND ED. (John B. Sullivan, Jr. & Gary R. Krieger eds., 2001) at 163, 172.

109.   By studying Japanese atomic bomb survivors and their offspring, the VA has assessed the long-term health effects from ionizing radiation: "Any radiation exposure level might in principle lead to cancer after a latency of years or even decades." HEALTH EFFECTS FROM CHEMICAL, BIOLOGICAL, AND RADIOLOGICAL WEAPONS, Department of Veterans Affairs, 2003, at 62, *available at*

http://www.publichealth.va.gov/docs/vhi/chem_bio_rad_weapons.pdf.

### 2.   IEDs Are Also Unique Hazards of Military Service.

110.   According to a 2005 Army and Marine Corp field manual, "[a]ttacks from improvised explosive devices (IEDs) are one of the major causes of Soldiers and Marines being killed in action (KIA) and wounded in action (WIA)." Randall R. Castro, *Forward, in* IMPROVISED EXPLOSIVE DEVICE DEFEAT, Field Manual Interim No. 3-34.119 & Marine Corps Information Publication No. 3-17.01 (2005) (hereinafter, "IMPROVISED EXPLOSIVE DEVICE DEFEAT), *available at*

http://www.ssi.army.mil/ncoa/AGS_SLC_ALC_REGS/FMI%203-

34.119.pdf.  The field manual further explains:

> The proliferation of IEDs on the battlefield in both
> Iraq and Afghanistan has posed the most pervasive
> threat facing coalition forces in those theaters.
> The persistent effectiveness of this threat has
> influenced unit operations, U.S. policy, and public
> perception.  IEDs are a weapon of choice and are
> likely to remain a major component of the Global
> War on Terrorism for the foreseeable future.

*Id.* at v.

111.   "The Joint Publication 1-02 ["JP 1-02"], *Department of Defense*

*Dictionary of Military and Associated Terms* sets forth standard US military

and associated terminology to encompass the joint activity of the Armed

Forces of the United States.  These military and associated terms, together

with their definitions, constitute approved DOD terminology for general use

by all DOD components."  *See*

http://www.dtic.mil/doctrine/new_pubs/jp1_02.pdf.

112.   On or about the time the TSGLI legislation was introduced and

signed into law, JP 1-02 defined "explosive ordnance" as follows:[3]

> *Explosive ordnance* is all munitions containing
> explosives, nuclear fission or fusion materials, and

---

[3] JP 1-02, as amended through Nov. 15, 2014, currently defines
"explosive ordnance" as "[a]ll munitions containing explosives, nuclear
fission or fusion materials, and biological and chemical agents."  *See*
http://www.dtic.mil/doctrine/new_pubs/jp1_02.pdf.

> biological and chemical agents.  This includes bombs and warheads; guided and ballistic missiles; artillery, mortar, rocket, and small arms ammunition; all mines, torpedoes, and depth charges; demolition charges; pyrotechnics; clusters and dispensers; cartridge and propellant-actuated devices; electro-explosive devices; clandestine and IEDs; and all similar or related items or components explosive in nature.

*See, e.g.,* IMPROVISED EXPLOSIVE DEVICE DEFEAT, at 1-5.

113.   On or about the time the TSGLI legislation was introduced and signed into law, JP 1-02 defined "improvised explosive device" as follows:[4]

> An *IED* is a device placed or fabricated in an improvised manner incorporating destructive, lethal, noxious, pyrotechnic, or incendiary chemicals and designed to destroy, incapacitate, harass, or distract.  It may incorporate military stores, but is normally devised from nonmilitary components.

*Id.*

114.   Just like each of the Enumerated Exemptions, IEDs are devices "intended to kill, seriously injure, or incapacitate humans through their physiological effects" (e.g., causing traumatic brain injuries).  And just like

---

[4] JP 1-02, as amended through Nov. 15, 2014, currently defines "improvised explosive device" as "[a] weapon that is fabricated or emplaced in an unconventional manner incorporating destructive, lethal, noxious, pyrotechnic, or incendiary chemicals designed to kill, destroy, incapacitate, harass, deny mobility, or distract."  *See* http://www.dtic.mil/doctrine/new_pubs/jp1_02.pdf.

the Enumerated Exemptions, exposure to explosive ordnance such as IEDs

represents one of the "unique hazards of military service."

### 3. IEDs Cause TBIs That Harm Through a Disease Process.

115.    Well before the TSGLI legislation and regulations, the medical

community regarded TBI as a disease process.  "***TBI*** should be considered

as both an inflammatory and/or a neurodegenerative ***disease*.**"  T.K.

McIntosh et al., *The Dorothy Russell Memorial Lecture: The Molecular and*

*Cellular Sequelae of Experimental Traumatic Brain Injury: Pathogenetic*

*Mechanisms*, 24 NEUROPATHOLOGY AND APPLIED NEUROBIOLOGY 251

(1998) (emphasis added).  That research has been cited over one hundred

times.  *See* **Ex. 32**.  "In ***TBI***, the ***disease process*** begins at the moment of

impact and extends thereafter for a protracted period of time."  RANDALL M.

CHESTNUT ET AL., EVIDENCE REPORT/TECHNOLOGY ASSESSMENT NUMBER 2:

REHABILITATION FOR TRAUMATIC BRAIN INJURY 12 (Agency for Health Care

Policy Research, U.S. Public Health Service 1999) (emphasis added).

116.    Time after time, the medical literature characterizes TBI as a

disease process.  *See, e.g.,* Kevin K.W. Wang et al., *Applying Proteomics in*

*Brain Injury Studies* [Abstract from 7th International Neurotrauma

Symposium, 2004], 23 RESTORATIVE NEUROLOGY AND NEUROSCIENCE 159

(2005) (discussing "a ***disease process*** such as ***TBI***" (emphasis added)); Ross

D. Zafonte, *Update on Biotechnology for TBI Rehabilitation: A Look at the Future*, 21 J. OF HEAD TRAUMA REHABILITATION 403 (2006) ("TRAUMATIC BRAIN INJURY (***TBI***) exists as a complex and multifactorial ***disease process***" (emphasis added)); Ross D. Zafonte, *Brain Injury Research: Lessons for Reinventing the Future.  The 38th Zeiter Lecture*, 88 ARCHIVES OF PHYSICAL MEDICINE AND REHABILITATION 551 (2007) ("***TBI*** is tiered into primary and secondary injuries. . . . It is this series of interacting events that creates a complex and multifactorial ***disease process***." (Emphasis added)); Grant V. Bochicchio et al., *Blast Injury in a Civilian Trauma Setting Is Associated With a Delay in Diagnosis of Traumatic Brain Injury*, 74 THE AM. SURGEON 267 (2008) ("Blast injury is a complicated ***disease process***, which may evolve over time, particularly with ***TBI***" (emphasis added)); David J. Loane et al., *Amyloid Precursor Protein Secretases as Therapeutic Targets for Traumatic Brain Injury*, 15 NATURE MED. 377 (2009) ("***TBI*** is a ***disease process***" (emphasis added)); Brent E. Masel & Douglas S. DeWitt, *Traumatic Brain Injury: A Disease Process, Not an Event*, 27 J. OF NEUROTRAUMA 1529 (2010) ("***TBI*** is a chronic ***disease process***, one that fits the World Health Organization definition" (emphasis added)); Andrew Losiniecki & Lori Shutter, *Management of Traumatic Brain Injury*, 12 CURRENT TREATMENT OPTIONS IN NEUROLOGY

142 (2010) ("[t]raumatic brain injury (**TBI**) is a complex ***disease process***" (emphasis added)); Firas H. Kobeissy et al., *Leveraging Biomarker Platforms and Systems Biology for Rehabilomics and Biologics Effectiveness Research*, 3 PM&R [American Academy of Physical Medicine and Rehabilitation] S139 (2011) ("***TBI*** should be seen as a chronic ***disease process***" (emphasis added)); NUTRITION AND TRAUMATIC BRAIN INJURY: IMPROVING ACUTE AND SUBACUTE HEALTH OUTCOMES IN MILITARY PERSONNEL 222 (John Erdman et al. eds. 2011) (discussing "a ***disease process*** as complex as ***TBI***") (emphasis added)); V. Ramana Feeser & Roger M. Loria, *Modulation of Traumatic Brain Injury Using Progesterone and The Role of Glial Cells on Its Neuroprotective Actions*, 237 J. OF NEUROIMMUNOLOGY 4 (2011) ("***TBI*** is a complex ***disease process***" (emphasis added)); Rebekah C. Mannix & Michael J. Whalen, *Traumatic Brain Injury, Microglia, and Beta Amyloid*, in INTERNATIONAL JOURNAL OF ALZHEIMER'S DISEASE NO. 608732 (Hindawi Pub'g Corp. 2012) ("***TBI*** is a ***disease process***" (emphasis added)); Carsten Kock-Jensen & Leanne Enggaard Langhorn, *Neurorehabilitation in Neurointensive Care*, *in* MANAGEMENT OF SEVERE TRAUMATIC BRAIN INJURY (Terje Sundstrøm *et al.* eds., 2012) ("Traumatic brain injury (**TBI**) is an acute, subacute and a chronic ***disease***." (emphasis added)); Thamil Mani Sivanandama &

Mahendra Kumar Thakura, *Traumatic Brain Injury: A Risk Factor for Alzheimer's Disease*, 36 NEUROSCIENCE & BIOBEHAVIORAL REVS. 1376 (2012) ("***TBI*** initiates a chronic ***disease process***." (Emphasis added)); Diego F. Cortes et al., *High-Capacity Peptide-Centric Platform to Decode the Proteomic Response to Brain Injury*, 33 ELECTROPHORESIS 3712 (2012) ("Traumatic brain injury (***TBI***) is a progressive ***disease process***" (emphasis added)); Parmenion P. Tsitsopoulos & Niklas Marklund, *Amyloid-β Peptides and Tau Protein as Biomarkers in Cerebrospinal and Interstitial Fluid Following Traumatic Brain Injury: A Review of Experimental and Clinical Studies*, FRONTIERS IN NEUROLOGY, June 26, 2013, at 1 ("The pathophysiology of ***TBI*** is complex . . .  leading to a ***disease process*** which exacerbate[s] the injury for a prolonged period of time." (emphasis added)); Ye Xiong et al., *Animal Models of Traumatic Brain Injury*, 14 NATURE REV. NEUROSCIENCE 128 (2013) ("***TBI*** is not a single pathophysiological event but a complex ***disease process***" (emphasis added)); Brent E. Masel & Douglas S. DeWitt, *Traumatic Brain Injury Disease: Long-term Consequences of Traumatic Brain Injury, in* UNDERSTANDING TRAUMATIC BRAIN INJURY: CURRENT RESEARCH AND FUTURE DIRECTIONS 29 (Harvey Levin et al. eds. 2014) ("[a]lthough many patients survive the initial insult, ***TBI*** initiates a chronic ***disease process***" (emphasis added)); Neelima B.

Chauhan, *Chronic Neurodegenerative Consequences of Traumatic Brain Injury*, 32 RESTORATIVE NEUROLOGY AND NEUROSCIENCE 337 (2014) ("***TBI*** is more of a ***disease process*** than of an event" (emphasis added)).

117.   Explosive ordnance, such as an IED, therefore is just like the Enumerated Exemptions because "the process by which such hazards produce immediate harm may be characterized as a disease process." *See* 70 Fed. Reg. at 75,941 (interim final rule – Supplementary Information).  Each of the Enumerated Exemptions produce immediate bodily harm but their biological effects may *not* immediately manifest.  They may have a latency of months to years before manifesting.  So too does a TBI.

**H.     The TSGLI Rulemaking Process Suffered From Additional Flaws.**

118.   When the VA created the TSGLI regulations, in collaboration with DOD, the rulemaking process suffered from numerous other irregularities.

119.   The interim final rule published on December 22, 2005 stated simply that the VA modeled the TSGLI rules based on commercial Accidental Death and Dismemberment ("AD&D") policies:

> [T]hese ***rules implementing the TSGLI program are based on commercial AD&D policies***, which have a successful track record, because TSGLI is a rider to a group life insurance policy purchased from a commercial life insurance company and

> because AD&D policies are frequently provided as
> a rider to a commercial life insurance policy.

70 Fed. Reg. 75,940 (interim final rule – Supplementary Information).

120.   Yet the interim final rule omitted key disclosures subsequently made by the VA on September 7, 2006—over seven months after the close of the 30 day comment period on the interim final rule—during a Senate hearing before the Committee on Veterans' Affairs:

> In the commercial insurance industry, AD&D policies do not cover the loss of the ability to perform ADL. Therefore, to obtain a model for use in the TSGLI program as the law required, *we looked to long-term care insurance standards*. In long-term care insurance, the policies require that the insured be unable to perform ADL for an extended period of time in order to qualify for coverage. *In recognition of the intent of Congress that TSGLI premiums remain low*, it follows that TSGLI ADL standards must be restrictive so that premiums can remain at reasonable rate. In addition, we believe that ADL standards should be set at a high enough level so that only servicemembers sustaining a loss equal in severity to an amputation or other loss covered by the TSGLI program qualify for benefits.

"Prepared Statement of Thomas Lastowka, Director, Insurance Service, Veterans Benefits Administration, Department of Veterans Affairs," S. HRG. 109–746 at 14 (emphasis added).

121.   The interim final rule makes no mention of any reliance on long-term care insurance standards. Nor does the final rule. There is no

indication of whether modeling followed a stand-alone long-term care

("LTC") policy or instead a life insurance policy with an LTC rider.  From a

modeling perspective, the distinction is important.  An LTC rider might

provide that any payout is an acceleration of the life insurance policy's death

benefit (*i.e.,* a so-called accelerated benefit rider providing that the death

benefit paid to a beneficiary is decreased based on any LTC payout during

the life of the insured).  This is certainly not analogous to the operation of

SGLI and TSGLI; Title 38 does not specify that a TSGLI payment depletes

the SGLI payment made for example to one's family upon death.

122.   Nor does the interim final rule make any mention of any intent

on the part of Congress that TSGLI premiums remain low.  The sum total of

legislative history is a short statement made on the Senate floor by a single

senator.  His only comment concerning cost was a single sentence: "The

traumatic insurance would provide coverage for severely disabling

conditions at a cost of approximately $1 a month for participating service

members."  151 Cong. Rec. S4095 (Apr. 21, 2005) (statement of Sen.

Craig).  This sentence does not evidence any intent of Congress that TSGLI

premiums "remain low."  Turning to the language of the statute itself,

Congress provided that "premium amounts shall be determined on the basis

of sound actuarial principles" and "the rate may be adjusted . . . on the basis

of the experience under the policy."  38 U.S.C. § 1980A(e)(4) & (e)(5).

Congress anticipated "premium creep" as the TSGLI program matured.  Still

further, according to the interim final regulation, "[t]his [$1 per month]

premium is intended to ***cover only the civilian incidence*** of such injuries."

70 Fed. Reg. 75,940 (interim final rule – Executive Order 12866).  In other

words, Congress did not intend to escalate the premium due to a high

incidence of injuries occurring during military duty.

123.   These irregularities in the rulemaking process led to a final rule,

38 C.F.R. § 9.20, that was put in place without the agency meeting the

APA's requirements for advance disclosure and public comment.

**V.     McKinney's TSGLI Claim Was Wrongfully Denied.**

**A.     McKinney's TSGLI Claim Meets the Requirements that He
Sustained a Traumatic Injury Resulting in a Scheduled
Loss.**

124.   McKinney was covered by an SGLI policy during the

timeframe relevant to this action.  *See, e.g.,* DD Form 214, Certificate of

Release or Discharge from Active Duty for Hugh Campbell McKinney,

**Ex. 4**.

125.   McKinney made his claim for TSGLI benefits using the

standard form SGLV 8600 issued by the VA.  *See* **Ex. 17**.  This two-part

form includes a "Part A" entitled "Member's Claim Information and

Authorization" to be completed by the insured service member and a "Part B" entitled "Medical Professional's Statement" to be completed by a licensed practitioner.

>    1.    **McKinney Claimed a Traumatic Injury That Was Fully Corroborated By His Medical Records and Percipient Witnesses.**

126.   In "Part A" of form SGLV 8600, McKinney described his exposure to an IED explosion in Kirkuk, Iraq on October 9, 2005—the *traumatic event*—along with the *traumatic injury* that he sustained as a result thereof.  McKinney stated that he "blacked out" when the explosion occurred.  *Id.*  He executed the form on September 21, 2011, next to a warning under 18 U.S.C. § 1001 concerning the punishment for any intentionally false statement in the claim or willful misrepresentation relative thereto.  *Id.*

127.   In "Part A," McKinney also executed a required "HIPAA release" authorizing all of his physicians, health care professionals and providers, medical facilities, and medical examiners "to disclose my entire medical record for me or my dependents and any other health information concerning me to the Branch of Service and [Prudential's] Office of Servicemembers' Group Life Insurance (OSGLI) and its agents, employees, and representatives."  *Id.*  By executing the HIPAA release, McKinney

authorized his providers "to release and disclose my entire medical record without restriction." *Id.* The HIPAA release further states:

> This information is to be disclosed under this Authorization so that my Branch of Service and OSGLI may: 1) administer claims and determine or fulfill responsibility for coverage and provision of benefits, 2) administer coverage; and 3) conduct other legally permissible activities that relate to any coverage I have applied for with OSGLI.
>
> * * *
>
> I understand that if I refuse to sign this authorization to release my complete medical record, OSGLI may not be able to process my claim for benefits and may not be able to make any benefit payments.
>
> * * *
>
> NOTE: This release authorizes the branch of service and OSGLI to look at medical records. You may also be asked to provide these documents.

*Id.* The HIPAA form provides a box in which McKinney optionally could place "limits" on the HIPAA release, but McKinney did not indicate any limits and left the box empty. *Id.* Twice in Part A, the service member is instructed: "Member must complete and sign the HIPAA release." *Id.* McKinney did so, having executed the HIPAA release on September 21, 2011. *Id.*

128. At all times during consideration of McKinney's TSGLI claim—from initial consideration by his branch of service TSGLI office

through consideration of his appeal by the Army Review Boards Agency—
McKinney's entire medical record was available for review and
consideration in connection with the disposition of his claim.

129.   On information and belief, as permitted by the HIPAA release,
the branch of service TSGLI office obtains medical records of a claimant as
part of its investigation of each claim and consideration whether to certify
that the claimant had a qualifying loss.

130.   On October 9, 2005, when McKinney "took the brunt of the
blast" of an IED that exploded near his Humvee in Kirkuk, Iraq while he
was serving in the Army in Operation Iraqi Freedom, *see* **Ex. 7**, he
experienced a ***traumatic event*** as defined by 38 C.F.R. § 9.20(b)(1).
Namely, the concussive force of the IED explosion involved the application
of external force that caused damage to McKinney's body.  The VA has
explained that "'***external forces***' are forces acting between the body and the
environment, including contact forces and gravitational forces as well as
other environmental forces."  VA's TSGLI PROCEDURAL GUIDE, **Ex. 33** at 4
(emphasis in original).  The VA also has made clear that "[n]on-penetrating
blast injuries, such as those common with the use of improvised explosive
devices that cause concussive injuries, still involve *external force* and

- 53 -

violence from the power of the blast coming into contact with an individual." *Id.* (emphasis added).

131.   McKinney was "in good health prior to the active duty period" in Iraq and "there were no defined risk factors for a stroke." *See, e.g.,* **Ex. 21**. The Army considered McKinney to be medically qualified to serve (*i.e.,* he met the Army's medical fitness standards) and he was deployed to active duty in Iraq, a combat zone.

132.   McKinney suffered a ***traumatic injury*** from the October 9, 2005 IED explosion.  His body was physically damaged by the concussive force of the blast, as required by 38 C.F.R. § 9.20(c)(1), causing a TBI.

133.   McKinney's medical records corroborate the traumatic brain injury he suffered when the IED exploded near his vehicle.  *See, e.g.,* **Ex. 34** (indicating weakness, headaches, memory problems, vision problems, dizziness, fatigue, irritability, and hearing problems); **Ex. 14** (describing the October 9, 2005 IED explosion and McKinney's symptoms thereafter).

134.   Further corroboration of McKinney's traumatic brain injury, for example, was provided by Staff Sergeant David Gehrig who was in the Humvee with McKinney on October 9, 2005 when the IED exploded nearby. *See* **Ex. 7**.  Gehrig made a sworn statement, as a first-hand witness, in which he stated that McKinney "took the brunt of the blast," "seemed to not realize

that the blast had come and gone," was "shaken up," "really dazed," and his "mind was [i]n a loop [from] the blast for a few minutes." *Id.*

> **2.    McKinney Claimed a Scheduled Loss That Was Fully Corroborated By His Medical Records and Percipient Witnesses.**

135.    McKinney suffered a "***scheduled loss***" under the TSGLI coverage inasmuch as the traumatic brain injury he sustained resulted in inability to independently perform at least two ADLs for a minimum of 15 days.  38 C.F.R. § 9.20(f)(17).

136.    "Part B" of McKinney's Application for TSGLI Benefits was completed by a neurologist, Bradford L. Talcott, MD, Ph.D., from Eastern Idaho Neurological in Idaho Falls, Idaho.  *See* Ex. 17.  The statement by Dr. Talcott identifies "traumatic brain injury" as the "predominant reason" McKinney was unable to independently perform activities of daily living ("ADL").  *Id.*  "TBI due to IED explosions" and stroke are identified as the reasons.  *Id.*

137.    "Part B" states that "[t]he patient is considered unable to perform an activity independently only if he or she REQUIRES assistance to perform the activity."  *Id.*  In addition, the term "requires assistance" is defined on the form as physical assistance (hands-on), stand-by assistance (within arm's reach, or verbal assistance (must be instructed because of

- 55 -

cognitive impairment) "without which the patient would be INCAPABLE of performing the task." *Id.*

138.   Dr. Talcott indicated that from July 21, 2007 to September 30, 2007, McKinney required at least physical assistance and stand-by assistance, and sometimes additionally required verbal assistance, for all of the six ADL's set forth in 38 C.F.R. § 9.20(f)(17).  *Id.*  Specifically, Dr. Talcott indicated that during the aforementioned period of time, McKinney was: (1) unable to bathe independently ("Balance problems - needs help standing, turning, scrubbing"); (2) unable to maintain continence independently ("Trouble controlling flow"); (3) unable to dress independently ("Trouble stepping into pants, zipping, buttons too difficult for motor skills"); (4) unable to eat independently ("Reminder to swallow, assistance to get food in mouth.  Right Handed needs assistance"); (5) Unable to toilet independently ("Trouble walking + getting zipper or pants down"); and (6) unable to transfer independently ("Trouble getting up + down safely.  Trouble walking.").  *Id.*

139.   Dr. Talcott checked a box on the form indicating that "I have observed the patient's loss," rather than the box indicating a mere review of the patient's medical records.  *Id.*  He executed the form on September 28, 2011, affirming that "[t]his Medical Professional's Statement is based upon

my examination of the patient, and/or, a review of pertinent medical evidence." *Id.*  Below the place of execution, the form provides a warning under 18 U.S.C. § 1001 concerning the punishment for any intentionally false statement or willful misrepresentation. *Id.*

140.   Dr. Talcott is a medical professional who actually has interviewed, examined, and treated McKinney.  Dr. Talcott thus is a percipient witness as to the nature and extent of McKinney's traumatic injury and limitations arising from that injury.

141.   The information and opinions expressed by Dr. Talcott in the Medical Professional's Statement for McKinney's TSGLI claim were not *post hoc* because Dr. Talcott actually "observed the patient's loss." *Id.*

142.   McKinney's ADL losses certified by Dr. Talcott are substantiated by additional evidence.  For example, a "Patient Assessment" dated July 27, 2007 indicates that McKinney needed to be "supervised" with respect to each of grooming, bathing, upper body ("UB") and lower body ("LB") dressing, and tub/shower transfer. *See* **Ex. 18**. *Almost nine months after McKinney's July 21, 2007 stroke*, documentation submitted to the TSGLI program office demonstrates that he was still being treated with a "long term goal" of "[i]mprov[ing] cognition to safely and accurately

complete ADL's." *See, e.g.,* **Ex. 19** ("Plan of Treatment" with an "SOC Date" of March 8, 2008, indicating "Start Of Care" for further treatment).

143.   A percipient witness—McKinney's wife Jeanette—also provided an unrebutted statement substantiating McKinney's inability to independently complete the ADL's for a lengthy period of time.  *See* **Ex. 20**. In her May 14, 2012 letter, written in her various roles as "wife," "caretaker," and "witness of disability," Mrs. McKinney provided a first-hand account of her husband's inability to independently complete the ADL's after suffering the CVA.  *Id.*  She listed his hospitalization and then transfer to a rehabilitation center, his subsequent home health care, forty-five days during which she served as his "care provider," and six months during which she took him to occupational therapy, speech therapy, and physical therapy.  *Id.*

144.   McKinney's wife's statement as to the types and the duration of assistance that McKinney required and that she provided to him stands unrebutted in the administrative record and serves as conclusive proof that McKinney did indeed require and receive the assistance she described.

145.   In her May 14, 2012 letter, Mrs. McKinney stated:

> Hugh required help to ambulate, to dress, and undress, to bathe, to use the bathroom and to eat. He couldn't remember whether he had eaten, or used shampoo in the shower.  Hugh need[ed]

- 58 -

> assistance with buttons on shirts, zippers on pants, balance while stepping in and out of pants, assistance with getting to the bathroom and dealing with zippers and buttons on pants.   Hugh had balance issues and needed assistance in the shower.   Hugh is right handed and was unable to feed himself well, hold a drink, hold a spoon or fork, or to get the food to his mouth.

*Id.*

146.   McKinney's inability to independently perform at least two ADLs for at least 15 days satisfies the requirements for a "***scheduled loss***" arising from a traumatic brain injury.  38 C.F.R. § 9.20(f)(17).

147.   The period of July 21, 2007 to September 30, 2007 meets the durational requirement for a traumatic brain injury resulting in the loss of at least two ADLs for a minimum of 15 days.  That timeframe covers more than 60 consecutive days (but less than 90 days), and thus extends to each of 15, 30, and 60 consecutive days under the Schedule of Losses set forth in 38 C.F.R. § 9.20(f)(17).

**B.    Doctors Agree That the October 9, 2005 Explosion Caused McKinney to Have a TBI.**

148.   Five physicians—three from the VA and another two from private practice—all concur in their medical opinions that McKinney suffered a TBI from the concussive force of the IED explosion on October 9, 2005.  *See* **Ex. 9-14**.  Four of those doctors further concur in linking

McKinney's TBI to his stroke.  *See* **Ex. 9-12, 14**.  Those medical opinions

*all* pre-date the filing of McKinney's claim for TSGLI benefits in late 2011.

### 1.      Dr. DeLeon (Boise VA Medical Center).

149.   On March 20, 2008, Robin J. DeLeon, MD, Physical Medicine

and Rehabilitation, Chief Rehab Services, Chief PolyTrauma Services, at the

Boise VA Medical Center, prepared a "physical medicine rehab note"

concerning McKinney.  *See* **Ex. 9**.  This medical record states:

> The purpose of this note is to outline the injuries of Mr McKinney and provide an opinion on etiology.
>
> There are three major injuries affecting the patient
>
> 1) ***Traumatic Brain Injury from multiple Improvised Explosive Devi[c]es with the most severe being several meters from Hugh*** with associated amnesia and subsequent concentration problems and headaches.
>
> 2) ***Right Temporal Stroke*** with further injury to an already damage[d] brain complicated by insight deficits.
>
> 3) right C6 radiculopathy . . .
>
> It is frequent that mild to moderate TBI's go undiagnosed initially as the service member has no outward physical injury, but the difficulty in performing at a higher cognitive level shows up later, most often [noticed] by family members post deployment.
>
> In conversations with Neurologist, ***there is no clear cause of his stroke as he has no identifiable risk factors that would cause one at his age.  It is***

> *possible the IED exposures increased his risk. It is my belief that it did.*
>
> Overall, *I feel that all three conditions are connected to the IED exposures* and should be service connected.

*Id.* (emphasis added).

150.   Dr. DeLeon is a medical professional who actually has interviewed, examined, and overseen treatment with respect to McKinney. *See, e.g.,* **Ex. 9**.  Dr. DeLeon thus is a percipient witness as to the nature and extent of McKinney's traumatic injury and limitations arising from that injury.

151.   Dr. DeLeon has served in the Army Medical Corp, *see* 142 CONG. REC. S7791 (daily ed. July 11, 1996) and achieved the rank of colonel in the Army Reserves, *see* 155 CONG. REC. S5563 (daily ed. May 18, 2009). Dr. DeLeon also served in Operation Iraqi Freedom.  *See, e.g.,* "Doc in Iraq wants shoes for the kids," *Weiser Signal American*, Feb. 23, 2005, *available at* http://www.ruralnetwork.net/~newsroom/story%2005026.htm.

### 2.   Dr. Morton (Private Practice).

152.   In a letter concerning McKinney dated April 14, 2008, Jared C. Morton, MD, of Eastern Idaho Medical Consultants, Idaho Falls, Idaho, stated:

> . . . Of note, the patient also suffered a right temporal stroke in the past, again with unclear etiology.  The patient has no identifiable standard risk factors that would cause stroke or other neurologic deficits.
>
> . . . [I]t is my medical opinion and belief that the patient's aforementioned neurologic conditions are probably connected to his exposures to improvised explosive devices . . .

*See* **Ex. 11**.

153.   Dr. Morton is a medical professional who actually has interviewed, examined, and overseen treatment with respect to McKinney.  *Id.*  Dr. Morton thus is a percipient witness as to the nature and extent of McKinney's traumatic injury and limitations arising from that injury.

### 3.    Dr. Corgiat (Private Practice).

154.   On March 13, 2009, Mark D. Corgiat, Ph.D., a clinical psychologist in Ogden, Utah, provided a written neuropsychological evaluation of McKinney and concluded:

> Overall, the current neuropsychological evaluation would be very consistent with the diagnoses noted in the medical record related to repeated exposures to IED's in Iraq.  Mr. McKinney's performance is consistent with mild traumatic brain injury.

*See* **Ex. 12**.

155.   Dr. Corgiat is a medical professional who actually has interviewed and examined McKinney.  *Id.*  Dr. Corgiat thus is a percipient

witness as to the nature and extent of McKinney's traumatic injury and

limitations arising from that injury.

### 4. Dr. Satovick (Salt Lake City VA Hospital).

156. On July 13, 2009, McKinney was examined by Robert

Satovick, MD, a neurologist in the compensation and pension clinic of the

Salt Lake City VA Hospital. *See* **Ex. 13**. In addition to the in-person

examination, Dr. Satovick reviewed McKinney's Claims file ("C-file"). *Id.*

157. In his "examination results," dated July 14, 2009 , Dr. Satovick

compiled a "history of present illness" in which he recounted the October

2005 IED explosion:

> [McKinney] felt a concussion of the blast and felt
> he lost consciousness for about five seconds.
> When he regained his consciousness he felt
> somewhat confused.

*Id.*

158. In his "examination results," dated July 14, 2009, Dr. Satovick

also noted that "[t]he veteran [McKinney] has always been healthy from a

medical point of view." *Id.*

159. Importantly, in his July 14, 2009 "examination results," Dr.

Satovick provided the following diagnosis:

> It is this examiner's opinion that the veteran did in
> fact experience mild to moderate traumatic brain

injury as a result of the explosions he was near during his tour in Iraq.

*Id.*

160.   Dr. Satovick is a medical professional who actually has interviewed and examined McKinney.  *Id.*  Dr. Satovick thus is a percipient witness as to the nature and extent of McKinney's traumatic injury and limitations arising from that injury.

### 5.   Dr. Burns (VA's Salt Lake City Health Care System).

161.   Leland Burns, MD, a physician in the VA's Salt Lake City Health Care System ("HCS") who is Board certified in psychiatry, *see* http://www.va.gov/providerinfo/saltlakecity/detail.asp?providerid=258, conducted a Compensation & Pension Exam in connection with deciding McKinney's disability compensation claim.  *See* **Ex. 14**.  As described in a September 21, 2009 medical report, Dr. Burns was tasked with "special instructions" as follows:

> The question becomes, was there adequate evidence to support a traumatic brain injury prior to the veteran's stroke event?  If so, ***did the traumatic brain injury cause the subsequent stroke event***? . . . Please review, examine and provide opinion and state your conclusions using legally recognized phrases.

*Id.*  Dr. Burns personally examined McKinney, as well as reviewed McKinney's Claims file ("C-file"), Certificate of Release or Discharge from

Active Duty ("DD-214"), numerous medical records, as well as previous compensation and pension exams. *Id.*

162.    Recounting his interview with McKinney during the course of his examination, Dr. Burns memorialized McKinney's description of how he felt when the October 9, 2005 IED explosion occurred:

> He felt some pressure on his skull over the left parietal area at the time. He remembered feeling unconscious for perhaps another five seconds and commenting to others that the "round of explosives was really strong."

*Id.*

163.    Dr. Burns opined in his report that a full year *before* McKinney suffered his stroke in July 2007, he had numerous documented symptoms of a TBI:

> Those symptoms on [McKinney's] post service questionnaire in July *[sic.]* 2006 that are more likely than not traumatic brain injury related are weakness, headaches, memory problems, vision problems, dizziness, fatigue and irritability.

*Id.* McKinney also reported hearing problems (ringing of the ears, also known as tinnitus). *See* **Ex. 34**.

164.    Dr. Burns further opined:

> The veteran reporting fatigue in his military records from November 2005 is likely secondary to traumatic brain injury, and his hand numbness is possibly related to traumatic brain injury."

*See* **Ex. 14**.

165.    From his examination of McKinney and review of McKinney's

records, Dr. Burns concluded:

> The stroke that the veteran suffered may be
> indirectly related to traumatic brain injury and is at
> least as likely as not caused by or is the result of
> traumatic brain injury.

*Id.*

166.    When "asked to comment on if there was adequate evidence to

support a traumatic brain injury prior to the stroke event," Dr. Burns

concluded "there is adequate information" and referenced McKinney's

exposure to IEDs.  *Id.*

167.    Dr. Burns is a medical professional who actually has

interviewed and examined McKinney.  *Id.*  Dr. Burns thus is a percipient

witness as to the nature and extent of McKinney's traumatic injury and

limitations arising from that injury.

**C.    Concurring Medical Opinions Link McKinney's TBI to His
        Stroke.**

168.    Dr. DeLeon (VA), Dr. Burns (VA), Dr. Corgiat (private

practice), and Dr. Morton (private practice) all concur in their medical

opinions that the IED explosion (which caused a TBI) is linked to

McKinney's stroke.  *See* **Ex. 9-12, 14**.  Only Dr. Satovick failed to reach that conclusion.  *See* **Ex. 13**.

169.   In an opinion that Dr. Burns later overruled, *see* **Ex. 14**, Dr. Satovick provided only two reasons for why he concluded that "the stroke symptoms are not secondary to the veteran's traumatic brain injury."  *See* **Ex. 13**.  Specifically, Dr. Satovick found it relevant that (1) McKinney did not sustain any direct or penetrating head injury during his stay in Iraq and (2) McKinney's stroke symptoms developed almost two years after he left Iraq.  *Id.*  But in a series of peer reviewed publications, the medical community—including at the VA—has comprehensively debunked any notion that either of these observations is material to determining whether a patient's TBI is linked to stroke.

### 1.   The Link Between TBIs and Strokes is Now Well-Recognized by the Medical Community.

170.   First, research published in a prominent, peer-reviewed medical journal—and written by a doctor from the VA—has shown that "TBI *is* associated with ischemic stroke, independent of other major predictors."  *See* James F. Burke *et al.*, "Traumatic brain injury may be an independent risk factor for stroke," *Neurology*, Vol. 81 No. 1 (July 2, 2013), 33-39 at 33 (emphasis added).  The research paper reported:

> The risk of stroke after TBI persisted even when
> excluding cases of stroke within 60 days of
> trauma. . . . We also found that the TBI-stroke
> association was of considerably greater magnitude
> in the population younger than 50 years (OR 1.56)
> vs those 50 years and older (OR 1.22), suggesting
> that TBI may be uniquely important in younger
> patients.

*Id.* at 36. Individuals suffering a TBI were found to have a significantly

greater likelihood of having a stroke compared to those who did not suffer a

TBI, over an average follow-up period of more than two years (28 months).

*Id.* at 35. Still further, the authors cautioned "it is possible that the reported

association between TBI and stroke represents an underestimate." *Id.* at 37.

171.   Second, the authors also dispelled any myth that a direct or

penetrating head injury—rather than concussive force—is the harbinger of

stroke. They "analyzed the risk of ischemic stroke for TBI subtypes,"

including skull fracture, concussion, cerebral laceration/intracranial

hemorrhage, other intracranial injury, and unspecified TBI. *Id.* at 34. Based

on their analysis, "[a]ll TBI subtypes had a similar magnitude of association

with ischemic stroke." *Id.*

172.   The VA was aware of Burke's research and subsequent

publication during the administrative consideration of McKinney's

application for TSGLI benefits. Burke works for the VA. The July 2013

*Neurology* paper initially was submitted for publication and received on

- 68 -

October 26, 2012, and was accepted in final form on March 11, 2013.  *Id.* at 38.  Research and preparation of the initial draft of the paper thus occurred prior to October 26, 2012.  As the principal author of the paper, "Dr. Burke drafted the initial manuscript, participated in development of study design, performed the primary data analysis, and acquired the data."  *Id.* at 38.  The VA cannot deny knowledge of the July 2013 *Neurology* paper.

173.   If the Army was unaware of Burke's research and subsequent publication during the administrative consideration of McKinney's application for TSGLI benefits, then the Army's denial certainly was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

174.   The TBI-stroke link has been independently confirmed by other researchers.  *See, e.g.,* Chien-Chang Liao et al., *Stroke Risk and Outcomes in Patients With Traumatic Brain Injury: 2 Nationwide Studies*, 89 MAYO CLINIC PROCEEDINGS 163 (2014) ("Traumatic brain injury was associated with risk of stroke" and "[p]atients with mild TBI . . . were at increased risk for stroke.").

### 2.   Recent Medical Opinions Continue to Link McKinney's TBI and His Stroke.

175.   Later in 2013, after the VA's published research showed a TBI-stroke association "uniquely important" in patients under the age of 50 like

McKinney, he continued to be examined by and treated under the care of Dr.

DeLeon at the Boise VA Medical Center. On December 31, 2013, Dr.

DeLeon provided a medical report and opinion as follows:

> During his deployment to Iraq he suffered at least three exposures to explosions with 3 docume[nt]ed in my H&P [(History & Physical Examination)]. The first two did not have the features of suffering a TBI as he did not report either losing consciousness or having post traumatic amnesia. *[H]owever the third event [] occur[r]ed during October 2005 when a roadside IED exploded about 20 meter[s] away. [T]his event is associated with post traumatic amnesia of less than one day duration.* The event is supported by the sworn statement of David Gehrig . . .
>
>               \*   \*   \*
>
> Post returning home, he suffered a CVA. The risk[] of CVA in such a young man is not expected . . .
>
>               \*   \*   \*
>
> *My overall asses[s]ment is TBI from deployment related concussion due to IED exposure in 2005* . . . The TBI opinion is further supported by a third party description of Hugh's actions/mental state immediately following the blast.
>
> Under current medical protocols i[t] would be expected that Hugh be removed from duty and immediately report to a medical facility for further eval[ua]tion and treatment. He would not return to duty till cleared by medical providers. The MACE exami[na]tion, however, did not exist on the battlefield in 2005. The VA system did not formally recognize mild to modera[t]e TBI till

> 2006 when it launched the TBI/polytr[au]ma program and did not start formal TBI second level evalua[ti]ons till 2007.
>
> I support recognition of Mr McKinney's TBI injury as service, specifically, combat related.

**Ex. 10** (emphasis added).

176.   As for McKinney's two blast exposures prior to the October 9, 2005 IED explosion—noted and dismissed as not being associated with TBI in Dr. DeLeon's medical report and opinion—the VA's TSGLI PROCEDURAL GUIDE also specifically instructs that they are *not* to be considered as the date of the traumatic event.  *See* **Ex. 33** at 48 ("For non-penetrating blast injuries that occur more than seven full days apart AND whose cumulative concussive effects cause a single qualifying loss, the latest occurring verified blast injury should be used as the date of the traumatic event in order to give the member the longest two-year window to incur losses.").

177.   The third party description cited by Dr. DeLeon was from Staff Sergeant David Gehrig—a percipient witness to the IED blast and its effects on McKinney—who made a sworn declaration that McKinney "took the brunt of the blast," "seemed to not realize that the blast had come and gone," was "shaken up," "really dazed," and his "mind was [i]n a loop of the blast for a few minutes."  *See* **Ex. 7**.

178.   Gehrig's observations, made from the vantage point of a soldier

present in the Humvee with McKinney during the blast, are perfectly

consistent with the clinical signs of TBI.  Beginning in 2007, DOD defined

"traumatic brain injury" as:

> a traumatically induced structural injury and/or
> physiological disruption of brain function as a
> result of an external force that is indicated by new
> onset or worsening of at least one of the following
> clinical signs, immediately following the event:
> *any period of loss of or a decreased level of
> consciousness*; any loss of memory for events
> immediately before or after the injury; *any
> alteration in mental state at the time of the injury
> (confusion, disorientation, slowed thinking, etc.)*;
> neurological deficits (weakness, loss of balance,
> change in vision, praxis, paresis/plegia, sensory
> loss, aphasia, etc.) that may or may not be
> transient; Intracranial lesion.

*See, e.g.,* TRAUMATIC BRAIN INJURY: DEFINITION AND REPORTING, The

Assistant Secretary of Defense, Health Affairs, Oct. 1, 2007, *available at*

http://www.health.mil/~/media/MHS/Policy%20Files/Import/07-030.ashx.

179.   McKinney himself has stated that he "blacked out" when the

October 9, 2005 IED explosion occurred.  *See, e.g.,* **Ex. 17** at 4 (Traumatic

Injury Information).

180.   Indeed, the VA's most recent evaluation of McKinney states

that "the evidence shows the veteran currently has a ***total service-connected***

***disability***, permanent in nature" and "the evidence documents you were

permanently and totally disabled." *See* **Ex. 35** (emphasis added).  The VA

concluded that "[a]n overall 100 percent evaluation is assigned for

[McKinney's] traumatic brain injury residuals based on the highest level of

severity of 'Total'." *Id.*

### D.   Army Ultimately Denied McKinney's TSGLI Claim on Narrow Grounds Wholly Inconsistent With VA's Conclusion That McKinney's TBI Caused His Stroke.

181.   On information and belief, when determining whether a TSGLI

claimant had a qualifying loss, the branch of service TSGLI office—in this

case the Army—completes a two-page "TSGLI Claim Certification

Worksheet" which includes a section entitled "Disposition of Losses

Claimed."  In that section, the branch of service TSGLI certifying official

decides whether each claimed loss (*e.g.,* loss of sight, loss of hearing,

amputation, loss of ADL due to TBI) is approved or denied for TSGLI

payment, and indicates the reason(s) for all losses listed as 'Not Found' by

entering the appropriate decision code(s). The decision codes may include

any of seventeen Loss Disposition Codes specified on the Worksheet (and

set forth in the VA's TSGLI PROCEDURAL GUIDE).

182.   By letter dated January 6, 2012, Prudential's Office of

Servicemembers' Group Life Insurance informed McKinney that his claim

for TSGLI benefits was denied for two reasons: (1) there allegedly was not

enough medical information to support his losses; and (2) the medical

evidence allegedly supported losses that occurred more than 730 days after

the traumatic event.  *See* **Ex. 22**.  In particular, the letter stated:

> Your branch of service has completed evaluating your claim for Traumatic Injury Protection under Servicemembers' Group Life Insurance (TSGLI) benefits.  Unfortunately, your claim could not be approved. . . .
>
> **Why Your Claim Was Not Approved**
> Your claim for hospitalization and inability to independently perform activities of daily living (ADL's) due to traumatic brain injury or other traumatic injury was not approved because ***there is not enough medical information to support your losses***.  To be eligible for the TSGLI benefit, your medical providers must present information that demonstrates the extent of your losses.  This information must address the specific injury/injuries you sustained and illustrate a timeline of treatment.  The timeline of treatment would consist of notations from licensed medical providers such as physicians, physician assistants, nurse practitioners, and registered nurses.  Supporting documentation can also be submitted by other medical providers pertinent to the sustained injury/injuries, to include occupational/physical therapists, optometrists, audiologists, or speech/language pathologists.
>
> To be eligible for a TSGLI payment, your loss must have occurred within 730 days of the traumatic event.  Because ***the medical evidence supports losses that occurred more than 730 days after the traumatic event***, your branch of service could not approve your claim.

*Id.* (emphasis added).

- 74 -

183.   On information and belief, the denial letter dated January 6, 2012 thus relies on two loss disposition codes set forth in the VA's TSGLI PROCEDURAL GUIDE that governs the claim review process: Code 14 corresponding to "[i]nsufficient information to support the medical professional's statement" (used when "the claim information and/or documentation does not support the claimed loss(es)") and Code 4 corresponding to "[m]ember did not suffer the loss within the prescribed period as defined by the regulation" (used when "the loss the member is claimed occurred more than 730 days from the date of the traumatic event"). *See* VA's TSGLI PROCEDURAL GUIDE, **Ex. 33** at 51-2.

184.   McKinney appealed.  The Army's TSGLI program office "reconsidered the decision" and again "disapproved" his claim by letter dated June 25, 2012.  *See* **Ex. 23**.  However, the Army abandoned its previous rationale for denying McKinney's claim and relied on a new basis:

> **Why Your Claim Was Not Approved**
> Your claimed losses for hospitalization and Activities of Daily Living (ADLs) were due to *a stroke, which is a medical illness/disease* not covered by TSGLI standards.

*Id.* (emphasis added).

185.   On information and belief, the denial letter dated June 25, 2012 thus relies on only one loss disposition code set forth in the VA's TSGLI

- 75 -

PROCEDURAL GUIDE that governs the claim review process: Code 5

corresponding to "[m]ember's loss was due to a physical or mental illness or

disease other than those covered by TSGLI" (used when "the loss the

member is claiming is due to an illness or disease, except in the case of

illnesses or diseases caused by pyogenic infection, biological, chemical or

radiological weapon, or a contaminated substance"). *See* VA's TSGLI

PROCEDURAL GUIDE, **Ex. 33** at 51. The VA's TSGLI PROCEDURAL GUIDE

gives an example of when it is appropriate to deny a claim based on Code 5:

"Member claims loss of right leg on Part A. Medical professional

documents loss of right leg on Part B but notes it is due to diabetes, not a

traumatic event. The certifier should use Loss Disposition Code 5 to

indicate denial." *Id.*

186.   McKinney appealed yet again. By letter dated October 2, 2012,

*see* **Ex. 36**, counsel for McKinney forwarded to the TSGLI program office

further documentation supporting his claim for benefits, including: (1) a VA

decision dated September 30, 2009 regarding McKinney's claim for VA

benefits and summarizing McKinney's related medical evidence (*see* **Ex.

21**); (2) letters from McKinney's wife Jeanette substantiating effective dates

and the effect of his injury on his activities of daily living (*see* **Ex. 20**); (3) a

letter from McKinney himself (*see* **Ex. 37**); (4) sworn statements from

McKinney (*see* **Ex. 8**) and Staff Sergeant David Gehrig (*see* **Ex. 7**)

concerning the October 9, 2005 IED incident; (5) a letter from McKinney's

doctor at Eastern Idaho Medical Consultants, Jared C. Morton, MD (*see* **Ex. 11**); and (6) approximately 20 pages of rehabilitation notes describing

therapy, "ADL Training," and "Caregiver training," including goals of

teaching claimant to "feed" himself, as well as indicating "toilet" therapy,

"dressing" therapy, hygiene therapy, gait, mobility and balance therapy, and

speech and cognitive therapy.  *See* **Ex. 38**.

187.   By letter dated April 4, 2013, the TSGLI program office again

informed him that "[a]fter reviewing the claim and supporting

documentation, we are unable to overturn the previous adjudication."  *See*

**Ex. 24**.  The rationale for the Army's decision remained essentially the

same:

> **Why Your Claim Was Not Approved**
> The medical documents submitted did not indicate
> that your ***losses were a result of*** a qualifying
> traumatic event but from a ***physical illness
> (stroke)***.   A qualifying traumatic event is the
> application of an external force, violence,
> chemical, biological, or radiological weapons,
> accidental ingestion of a contaminated substance,
> or exposure to the elements that causes damage to
> the body per TSGLI guidelines.

*Id.* (emphasis added).  The April 4, 2013 letter also stated that McKinney

could next appeal to the Army Review Boards Agency ("ARBA") or,

alternatively, that "members have the right to file suit in federal court to contest an adverse TSGLI decision." *Id.*

188.   On information and belief, by its denial letter dated April 4, 2013, the Army again relied on only one loss disposition code set forth in the VA's TSGLI PROCEDURAL GUIDE that governs the claim review process: Code 5 corresponding to "[m]ember's loss was due to a physical or mental illness or disease other than those covered by TSGLI." *See* VA's TSGLI PROCEDURAL GUIDE, **Ex. 33** at 51.

189.   By its reliance solely on disposition code 5, the Army denied McKinney's TSGLI claim on very limited grounds.  And the Army's conclusion that illness or disease was to blame, rather than McKinney's TBI, is utterly inconsistent—in fact, opposite—to the conclusion reached by the VA when considering McKinney's eligibility for disability benefits.

190.   For example, in a September 30, 2009 Decision Review Officer Decision by the VA's Boise Regional Office concerning disability benefits, the VA concluded:

> Service connection for the left temporal region ***stroke event has been established as related to the service-connected disability of mild to moderate traumatic brain injury*** (with reasonable doubt in your favor).

> \*   \*   \*

> *. . . **The overall evidence supports the finding of a mild to moderate traumatic brain injury associated with rocket and IED blast events in Iraq**.*

*See* **Ex. 21**.

191.   As a separate matter, notably, <u>none</u> of the January 6, 2012, June 25, 2012, and April 4, 2013 letters from the Army denied McKinney's claim on any alleged lack of direct causal connection between the traumatic injury he suffered in Kirkuk, Iraq on October 9, 2005 from the concussive force of a nearby IED explosion and the CVA (stroke) he suffered on July 21, 2007. *See* **Ex. 22-24**.  Such a denial is made, if at all, with disposition code 6 in the VA's TSGLI PROCEDURAL GUIDE.  *See* **Ex. 33** at 51 ("[m]ember's loss is not a direct result of a traumatic event" used when "the loss the member is claiming was not due to traumatic event, but some other reason").   None of these denial letters used phraseology consistent with disposition code 6.  *See* **Ex. 22-24**.  Regardless, ample evidence supports the direct causal link between the traumatic injury McKinney suffered in Kirkuk, Iraq on October 9, 2005 from the concussive force of a nearby IED explosion and the CVA (stroke) he suffered on July 21, 2007.  *See, e.g.,* **Ex. 9-12, 14**.

192.   Still further, in the January 6, 2012, June 25, 2012, and April 4, 2013 denial letters, the Army did <u>not</u> base the denial of McKinney's claim on disposition code 2 ("[m]ember's loss is not listed on TSGLI schedule of

losses," *e.g.,* inability to independently perform at least two ADLs). *See* **Ex. 22-24**. Regardless, ample evidence supports McKinney's inability to independently perform at least two ADLs following the CVA (stroke) he suffered on July 21, 2007. *See* **Ex. 17-20**.

### E. Any Reasonable Doubt Should Have Been Resolved in Favor of McKinney.

193. The Army's written denials of McKinney's eligibility for TSGLI benefits are silent concerning the adjudicatory standard applied to his claim. *See* **Ex. 22-24**. On information and belief, the Army did not apply the reasonable doubt standard set forth in 38 C.F.R. § 3.102 to the adjudication of McKinney's TSGLI claim.

194. According to Army precedent, "TSGLI analysts strive to apply a 'reasonable person' standard to each claim with a bias in favor of the claimant while still maintaining a high degree of internal consistency among similar claims." *See* **Ex. 39** (exemplary opinions of the Army Board for Correction of Military Records—the "ABCMR"—concerning TSGLI). However, in sworn deposition testimony on June 19, 2012, the Army's Officer in Charge ("OIC"), TSGLI—the certifying officer for all of the Army's decisions concerning TSGLI claims—was completely unfamiliar with that standard:

> Q:   Have you ever heard of applying a so-called
>       "reasonable person" standard in analyzing the
>       [TSGLI] claims?
>
> A:   No.

Rule 30(b)(6) Deposition Tr. of Captain James Addis, June 19, 2012, in

*Stringer v. United States of America*, Civ. No. 11-cv-02584 (D. Col.) at 153-

54, **Ex. 40** (testimony quoted from an excerpt of the Addis deposition

transcript which was filed as an exhibit to a motion in an action unrelated to

the present complaint).  The Army's TSGLI program office denied

McKinney's application long before this testimony (on January 6, 2012, **Ex.**

**22**); that office "reconsidered" and again denied any benefits less than a

week after the deposition (on June 25, 2012, **Ex. 23**).

195.   When the VA adjudicated McKinney's claim for disability

compensation benefits under a standard requiring that reasonable doubt be

resolved in favor of the veteran, the VA concluded that his "stroke event has

been established as related to the . . . traumatic brain injury (with reasonable

doubt in your favor)."  *See* **Ex. 21**.  The VA further concluded that "[t]he

overall evidence supports the finding of a mild to moderate traumatic brain

injury associated with rocket and IED blast events in Iraq."  *Id.*

**CAUSES OF ACTION**

<u>COUNT I</u>
**The Final Rule's Failure to Extend TSGLI Coverage to
Physical Illness or Disease Arising from TBI Violates the
APA.**

196.   McKinney reasserts and incorporates by reference each of the

above paragraphs.

197.   In collaboration with DOD, the VA issued a rule that draws

arbitrary and capricious distinctions in TSGLI's coverage of some traumatic

injuries arising from "unique hazards of military service," which cause

"immediate harm" that progresses through a "disease process," while

excluding others of likewise character.   IEDs are unique hazards to service

members, which cause immediate harm in the form of TBIs that follow a

disease process, just like a "physical illness or disease [that] is caused by a

pyogenic infection, biological, chemical, or radiological weapons, or

accidental ingestion of a contaminated substance" for which coverage is

provided.   Yet the VA's TSGLI rule treats TBIs arising from IEDs, and the

harms that follow, completely differently.

198.   The VA's "interim final rule" and subsequent final rule for the

TSGLI benefit, 37 C.F.R. § 9.20, completely fail to address the greatest

threat to our military in Iraq and Afghanistan—IEDs—which have wounded

many thousands of service members by causing TBIs.   The final rule is

silent concerning this unique hazard of military service, prejudicing service members who suffer traumatic brain injuries from IED blasts and then lose their ability to independently perform ADLs.

199.   The VA's final rule for the TSGLI benefit, 37 C.F.R. § 9.20, also completely fails to address the very nature of TBIs: they are a complex and progressive disease process whose harms occur over an extended timeframe.  The medical community, including doctors from the VA, overwhelmingly considers TBIs to harm through a disease process.

200.   IEDs are the bane of service members in modern warfare, causing TBIs to be the "signature wound" of the war in Iraq.  By omitting coverage here, without even any articulated rationale for doing so, the VA entirely "failed to consider an important aspect of the problem" it was undertaking to regulate, in violation of the APA.  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118-19 (D.C. Cir. 2010).

201.   The omission from 37 C.F.R. § 9.20 of IEDs as unique hazards of military service, which cause TBIs that harm by a disease process, is agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." *See* 5 U.S.C. §§ 706(2)(A) & 706(2)(C).

202.   McKinney is therefore entitled to relief pursuant to the APA, 5 U.S.C. §§ 701-06.

## COUNT II
### Failure to Provide Interested Persons Sufficient Opportunity to Participate in the TSGLI Rulemaking Violates the APA.

203.   McKinney reasserts and incorporates by reference each of the above paragraphs.

204.   The APA provides that when an agency promulgates a rule, it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

205.   In collaboration with DOD, the VA did not give fair notice of how the final rule for the TSGLI benefit, 37 C.F.R. § 9.20, would implement very restrictive TSGLI standards based on: a blind spot to the disease process by which TBIs cause harm; adjudicatory standards that are unknown to service members and likewise those who adjudicate TSGLI claims; a long-term care insurance model; and an alleged decree from Congress to keep premiums low.  DOD and VA thus denied McKinney and other

members of the public of the opportunity to comment on the significant adverse consequences of the approaches they adopted.

206.   McKinney is therefore entitled to relief pursuant to the APA, 5 U.S.C. §§ 701-06.

**C<small>OUNT</small> III**
**TSGLI Benefits Have Been Wrongfully Denied.**

207.   McKinney reasserts and incorporates by reference each of the above paragraphs.

208.   Section 1980A of Title 38 confers a right to monetary benefits by providing that a service member who is insured under SGLI and who experiences a traumatic event, directly resulting in a traumatic injury and causing a scheduled loss, is eligible for and entitled to a TSGLI payment.

209.   The Army is bound by 38 U.S.C. § 1980A and 38 C.F.R. § 9.20.

210.   The Army wrongfully denied McKinney's eligibility for and entitlement to TSGLI payment by failing to find that McKinney's scheduled loss was caused by the TBI he suffered when he was exposed to an IED explosion on October 9, 2005.  McKinney's losses were a result of a qualifying traumatic event (the concussive force of the IED blast which caused a TBI) rather than merely from a "physical illness" (stroke) as the Army erroneously concluded.

211.   The Army also wrongfully denied McKinney's eligibility for and entitlement to the TSGLI payment mandated under 38 U.S.C. § 1980A and 38 C.F.R. § 9.20 by applying adjudicatory standards that lack the force of law, lack deference, and circumvent provisions of 38 U.S.C. § 1980A, 38 C.F.R. § 9.20, 38 C.F.R. § 3.102, 5 U.S.C. § 553, and applicable precedent.

212.   The Army's denial of McKinney's claim for TSGLI benefits was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law, and unsupported by substantial evidence.

213.   The Army's denial of McKinney's claim for TSGLI benefits was also in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

214.   The Army's denial of McKinney's claim for TSGLI benefits is not substantially justified.

215.   Unless relief is granted by this Court, McKinney will be injured, in part, because his claim for TSGLI benefits remains denied by the Army.  By virtue of that denial, McKinney is prejudiced and unable to receive the traumatic injury protection monetary benefit to which he is entitled.  McKinney is entitled to relief pursuant to the APA, 5 U.S.C. §§ 701-06.

216.   To the extent necessary, McKinney has exhausted his administrative remedies with respect to his TSGLI claim and adjudication thereof by the Army.

## REQUESTS FOR RELIEF

WHEREFORE, McKinney requests that the Court:

(1)   enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, the portions of the TSGLI final rule defining a "traumatic injury" with respect to physical illness or disease to only include physical illness or disease caused by a pyogenic infection, biological, chemical, or radiological weapons, or accidental ingestion of a contaminated substance (37 C.F.R. § 9.20(c)(2)(ii)) and excluding payment of benefits for a scheduled loss resulting from a physical or mental illness or disease, "whether or not caused by a traumatic injury," other than a pyogenic infection or physical illness or disease caused by biological, chemical, or radiological weapons or accidental ingestion of a contaminated substance (37 C.F.R. § 9.20(e)(4)(i));

(2)   enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the TSGLI final rule, 37 C.F.R. § 9.20, was not promulgated in accordance with law within the meaning of the APA, which requires fair notice of how the final rule would implement very restrictive standards;

(3)   vacate and set aside the TSGLI final rule's provisions in 37 C.F.R. § 9.20 that are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

(4)   vacate and set aside the TSGLI final rule's provisions in 37 C.F.R. § 9.20 that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(5)   vacate and set aside the Army's findings and denial of McKinney's claim for TSGLI benefits;

(6)   declare, and direct the Army to certify, that McKinney meets the requirements for TSGLI benefits eligibility for the period beginning July 21, 2007 and ending September 30, 2007, based on his inability to independently perform the ADLs of bathing, continence, dressing, eating, toileting, and transferring during that timeframe, the result of traumatic injury to his brain from exposure to an IED blast;

(7) declare, and direct the Army to certify, that McKinney meets the requirements for TSGLI benefits to be paid for the loss of at least two ADLs extending to each of 15, 30, and 60 consecutive days, for a total of $75,000;

(8) award McKinney his costs and reasonable attorneys' fees incurred in this action; and

(9) grant all other such relief to McKinney as this Court deems just, proper and equitable.

Dated:  December 22, 2014          Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
     Email:  watkins@adduci.com
ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006

*Attorneys for Plaintiff*
*Hugh Campbell McKinney*